**UNITED STATES of America, Appellee,**

v.

**Daniel R. HENNEBERRY and William A. Youngerman, Appellants.**

Nos. 82–1829, 82–1830.

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1983.

Decided Oct. 27, 1983.

Certiorari Denied March 19, 1984.
See 104 S.Ct. 1612.

Martin, Bahn & Cervantes, James M. Martin, St. Louis, Mo., for appellant Henneberry.

Robert A. Hampe, St. Louis, Mo., for appellant Youngerman.

Thomas E. Dittmeier, U.S. Atty., Mitchell F. Stevens, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before LAY, Chief Judge, and McMILLIAN and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

The sale of a truckload of Panasonic electronic equipment to an FBI sting operation resulted in the indictment of William Youngerman and Daniel Henneberry for conspiring to receive and possess stolen goods in violation of 18 U.S.C. § 371, and for receiving and possessing those goods in violation of 18 U.S.C. § 659. Youngerman was convicted of both counts and Henneberry the § 659 count. The district court[1] sentenced Youngerman to fifteen years' imprisonment, and Henneberry to thirty months' imprisonment. Both appeal, primarily contesting the sufficiency of the evidence underlying their convictions. They also challenge the stolen character of the goods in their possession, the admission of a bill of lading into evidence, the transcripts of voice recordings to the jury and numerous other claimed trial errors. We affirm the convictions.

Between July 1980, and March 1982, the Federal Bureau of Investigation conducted a "sting" operation in southeast Missouri to purchase stolen property. Two undercover FBI agents, Richard Heideman and Ray Christopher operated an automobile salvage yard called Leblanc Auto Sales, in Benton, Missouri.

On January 7, 1982, Youngerman telephoned special agent Heideman and said that a 45-foot trailer loaded with televisions, video cameras and other electronic equipment had been stolen approximately two weeks before, that the value of the articles was approximately $320,000, and that if he and Mr. LeBlanc were interested in purchasing the goods they could probably buy them for $40,000. A series of telephone calls ensued between the agents and Youngerman. Finally, it was agreed that the agents would meet with Youngerman and that they would view the trailer and its contents, with the idea of possibly buying it.

On January 9, 1982, both undercover agents met with Youngerman at a tavern in St. Louis. There Youngerman introduced Larry Dryden to the agents and instructed the agents to follow them to a location in Mexico, Missouri. Upon arriving at the parking lot of J.C. Truck Repair, the agents were directed to a trailer truck which Henneberry was operating. The agents, Youngerman, and Dryden, approached the truck, and Henneberry was introduced to the agents. All five then proceeded to the back of the trailer. While Heideman stood outside with Henneberry and Dryden, Christopher and Youngerman entered the trailer and inventoried the Panasonic equipment it contained.

When the inventory was completed, all five met at the "Attic Lounge" in Mexico, Missouri. Following discussions concerning price, it was agreed that the agents would buy the trailer load for $32,000, and that the agents would bring their own tractor-truck to haul away the equipment.

On January 11, 1982, the agents met Youngerman at a prearranged location and proceeded to J.C. Truck Repair. There Youngerman and the agents were met by Dryden and Henneberry. With the assistance of Henneberry, the tractor-truck driven by the agents was hooked to the stolen trailer and the appropriate mechanical and electrical connections made. Agent Christopher, Youngerman, and Dryden entered

---

1. Honorable H. Kenneth Wangelin, United States District Judge for the Eastern District of Missouri.

Youngerman's car, and Christopher handed $32,000 in cash to Youngerman, who handed it to Dryden. The agents then left Mexico, Missouri, with the stolen load.

Later the FBI inventoried the load and determined that this was the same equipment that had been stolen from a Panasonic warehouse on December 23, 1981.

## I.

### A.

Youngerman and Henneberry contend that the trial court erred in denying their motion for acquittal because the evidence was insufficient to sustain their convictions under 18 U.S.C. § 659.

■ When an attack is made upon the sufficiency of the evidence, the jury's verdict must be sustained if there is substantial evidence, viewed in the light most favorable to the Government, to support it. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Abernathy,* 688 F.2d 576, 581 (8th Cir.1982). The Government is entitled to the benefit of all reasonable inferences. *United States v. Steffen,* 641 F.2d 591, 597 (8th Cir.), *cert. denied,* 452 U.S. 943, 101 S.Ct. 3091, 69 L.Ed.2d 959 (1981).

■ For a conviction under 18 U.S.C. § 659 the government must prove (1) that the chattels were stolen, (2) that they had a value in excess of $100, (3) that defendants had possession of the chattels, (4) that possession was with knowledge that the chattels were stolen, and (5) that the chattels were part of an interstate shipment. *United States v. Beck,* 659 F.2d 875, 877 (8th Cir.1981). In this appeal the only issues concern the evidence supporting the possession, knowledge, and interstate elements of the offense.

■ Evidence of actual possession is not necessary to sustain a conviction under the statute; constructive possession is sufficient. *United States v. Beck, supra,* 659 F.2d at 877; *United States v. Dugan,* 477 F.2d 140, 141 (8th Cir.1973); *United States v. Stephenson,* 474 F.2d 1353, 1355 (5th Cir.

1973); *Sewell v. United States,* 406 F.2d 1289, 1293 (8th Cir.1969). To be in constructive possession, a person must knowingly have both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons. *Sewell v. United States, supra,* 406 F.2d at 1293 n. 3.

■ The evidence is sufficient to support a finding that Youngerman and Henneberry were in constructive possession of the goods in question. On two separate occasions on January 7, 1982, and on one occasion on January 8, 1982, Youngerman spoke with the agents about buying the stolen property. On January 9, 1982, Youngerman spoke on the telephone on three occasions with the undercover agents regarding viewing and inventorying the load. That same day both Youngerman and Dryden met the agents for the purpose of directing the agents to the stolen load. After the agents followed Youngerman and Dryden to Mexico, Missouri, Youngerman physically got into the stolen trailer and conducted an inventory of goods along with the agent. After inventorying the load, the agent had a conversation with both Youngerman and Dryden as to whether or not he would take the load that night. Both Henneberry and Youngerman accompanied Dryden and the agents to the lounge in Mexico, Missouri, where the inventory and sales price were discussed. On January 11, 1982, Youngerman met the agents at a prearranged location along Highway 70 on the way to Mexico, Missouri. There Youngerman, Henneberry and Dryden accompanied the agent to the back of the trailer to view the contents once again.

As with Youngerman, Henneberry's actions during this period demonstrated a directive role in the delivery and concealment of the stolen property. Upon arrival at the location of the stolen tractor on January 9, the agents initially observed Henneberry in a tractor-trailer truck, which was running and attached to the stolen trailer. While Youngerman and one of the agents were in the trailer conducting inventory, Henneber-

ry was at the back of the trailer with his son who had what appeared to be a weapon projecting from his coat. Dryden told Henneberry at this time that if the agents were to take the load that night Henneberry would have to drive it immediately.

In addition to Henneberry's actions on January 9, and January 11, his conversations with the agents at the Attic Lounge indicated his possessory interest in the stolen goods. At the Attic Lounge when the discussion centered on the quantity of goods left in the trailer, Henneberry admitted to having previously counted the stolen goods, and further indicated that he previously tried to paint the trailer to hide its true nature, but the paint would not hold in cold weather.

The record provides direct evidence that the defendants knew the goods were stolen at the time of possession. During his initial conversation with Agent Heideman on January 7, 1982, Youngerman asked the agent whether he would be interested in a trailer loaded with electronic equipment and went on to elaborate that the goods and trailer were stolen two weeks earlier; this same information was related to Agent Christopher by Youngerman the same day. Henneberry admitted during his testimony at trial that he told Agent Heideman at the Attic Lounge on January 9, that Larry Dryden had stolen the trailer and that he did so by crashing the gates.

■ Henneberry contends, however, that he cannot be convicted of a possession offense because he had no knowledge that the goods inside the trailer were stolen at the time Dryden brought them to the area of Mexico, Missouri. Henneberry testified that Dryden, who was having marital problems, was hiding household furniture from his wife and that at the time the trailer was brought on the premises of J.C.'s Truck Repair, Henneberry had no idea that stolen property was inside the trailer. The short answer to Henneberry's argument is that section 659 does not require that knowledge exist from the incipiency of possession. During the time period charged in the indictment—January 9, 1982, to January 11,

1982—Henneberry admittedly did have knowledge that the goods were stolen.

■ To establish the interstate nexus requirement of section 659, there must be evidence that the stolen chattels or goods were "moving as or which are a part of or which constitute an interstate or foreign shipment of freight." 18 U.S.C. § 659 (1976). There is no requirement of literal movement; goods which are part of or constitute an interstate shipment are covered by the statute even if not in motion at the time of the theft. *United States v. Wills*, 593 F.2d 285, 286 (7th Cir.), *cert. denied*, 441 U.S. 964, 99 S.Ct. 2413, 60 L.Ed.2d 1070 (1979); *United States v. Williams*, 559 F.2d 1243, 1247 (4th Cir.1977). The test for determining whether goods are part of an interstate shipment is a practical one, *United States v. Crum*, 663 F.2d 771, 772 (8th Cir.1981); *United States v. Astolas*, 487 F.2d 275, 279 (2d Cir.1973), *cert. denied*, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974), and depends on a variety of factors, such as the relationship between the consignee, consignor, and carrier, the indicia of interstate commerce at the time of theft, and the preservation of the congressional intent in enacting the statute. *United States v. Garber*, 626 F.2d 1144, 1147 (3d Cir.1980), *cert. denied*, 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981). No single factor is conclusive in the determination. *United States v. Parent*, 484 F.2d 726, 729 (7th Cir.1973), *cert. denied*, 415 U.S. 923, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1974).

■ The evidence establishes that the goods were part of an interstate shipment as defined in 18 U.S.C. § 659. Mr. Robert Gates, general manager of Keller's, Inc., a warehouse subcontractor for Panasonic, testified that a bill of lading was prepared for the stolen shipment and that it shows a shipment from St. Louis, Missouri, to a Panasonic warehouse in Arlington Heights, Illinois, to be shipped by A.G.S. Truck Service. The shipment in question was picked up on December 18, 1981, and was then taken to a lot in St. Louis, was sealed, and was awaiting dispatch by A.G.S. at the time it was stolen. Considering all the evidence in a

practical light, we conclude that it was sufficient to establish an interstate nexus for the goods in question prior to their theft on December 23, 1982, notwithstanding the fact that the shipment never left the State of Missouri and that the bill of lading may have omitted a shipment date.

### B.

■ Youngerman also challenges the sufficiency of the evidence supporting his conspiracy conviction on the grounds that the Government failed to prove he had knowledge of the stolen character of the goods and that the Government attempted to prove knowledge and intent by offering evidence of other crimes. Youngerman argues that proof of specific intent is required for a section 659 conspiracy. However, since the offense of receiving stolen property, knowing it to be stolen, does not require specific intent,[2] the offense of conspiring to do so requires no more.[3] *United States v. Zarattini,* 552 F.2d 753, 760 (7th Cir.), *cert. denied,* 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262 (1977).

■ There was direct evidence that Youngerman knew, from the very outset, that the goods contained in the trailer were stolen. Further, in reviewing the record, we find no real indication that "other crimes" evidence was introduced. The agents testified that prior to January 7, 1982, they had previously met and conversed with Youngerman on several occasions. They did not, however, testify as to criminal misdeeds. Accordingly, we find no merit to Youngerman's contention.

### II.

■ Youngerman argues that the trial court erred in denying his motion for judgment of acquittal because by the time that he had any contact with the stolen goods, the goods had lost their stolen character. Youngerman argues that because the agents had viewed the property on January 9, 1982, and could have seized it at that time, the property was no longer stolen and that it was recovered by the agents on behalf of the owners.

Although police hold stolen goods in trust for the true owner, *United States v. Cawley,* 255 F.2d 338, 340 (3d Cir.1958), courts have not held the police to a duty immediately to take possession of goods known to be stolen. *United States v. Dove,* 629 F.2d 325, 327 (4th Cir.1980). A distinction has emerged between the actual recovery of stolen goods and the mere observation of those goods for purposes of apprehending persons who take possession of them. *See, e.g., United States v. Muzii,* 676 F.2d 919, 923 (2d Cir.1982); *Dove, supra,* 629 F.2d at 327; *United States v. Monasterski,* 567 F.2d 677, 680–81 (6th Cir.1977); *United States v. Egger,* 470 F.2d 1179, 1180–81 (9th Cir. 1972), *cert. denied,* 411 U.S. 954, 93 S.Ct. 1931, 36 L.Ed.2d 416 (1973); *United States v. Cawley, supra,* 255 F.2d at 340; *Copertino v. United States,* 256 F. 519, 520 (3d Cir.1919).

Of this long line of precedent, defendants rely primarily on *United States v. Monasterski* and *United States v. Cawley.* In *Monasterski* and *Cawley* the officials involved took actual possession of the goods and gained the cooperation of some of the thieves before the defendant became in-

---

**2.** 18 U.S.C. § 659 does not require specific intent. *E.g., United States v. Zarattini,* 552 F.2d 753 (7th Cir.), *cert. denied,* 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262 (1977); *United States v. Vilhotti,* 452 F.2d 1186 (2d Cir.1971), *cert. denied,* 406 U.S. 947, 92 S.Ct. 2051, 32 L.Ed.2d 335 (1972).

**3.** Although the Second Circuit has uniformly held that a conspiracy to violate section 659 requires the specific intention to buy, receive or possess goods which the defendants know were stolen from interstate commerce, *United States*

*v. Vilhotti, supra,* 452 F.2d at 1190, other circuits have consistently held to the contrary, *United States v. Zarattini, supra,* 552 F.2d at 753; *United States v. Newson,* 531 F.2d 979, 981 (10th Cir.1976); *United States v. Roselli,* 432 F.2d 879, 890–91 (9th Cir.1970); and the United States Supreme Court has stated that the reasoning relied on in the Second Circuit cases is "bad law" when applied to facts such as those before us. *United States v. Feola,* 420 U.S. 671, 690, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).

volved. In both cases it was held that the property lost its status as stolen once it was recovered.

In contrast to the facts in *Monasterski* and *Cawley,* the agents here merely observed the property and surveyed it until they could purchase it, so as not to reveal their true identity. On January 9, the two undercover agents were led to the stolen property. At that time the agents observed the goods and conducted an inventory of them, but did not in any fashion take possession of them. Any attempt to make an arrest at that time or to seize the property would have ended any other pending covert investigations. To find that the agents recovered the property on January 9, would affect law enforcement to the extent that "the difficulties in apprehending criminals in cases such as this would be immeasurably increased, and without reason." *Dove, supra,* 629 F.2d at 329. Accordingly, we reject appellant's contention.

### III.

Appellants contend that the trial court erred in admitting the bill of lading into evidence because the Government failed to provide an adequate foundation. They argue that there was not testimony that normal record keeping procedures were followed with this bill of lading, and that there was no explanation of the procedures used.

▮ We initially observe that the determination of the adequacy of the foundation for the admission of evidence is left to the discretion of the trial court and will be overturned on appeal only if there has been a clear abuse of discretion. *See, e.g. United States v. Reese,* 561 F.2d 894, 903 n. 18 (D.C.Cir.1977); *United States v. Calvert,* 523 F.2d 895, 911 (8th Cir.1975); *United States v. Fendley,* 522 F.2d 181, 184 (5th Cir.1975).

▮ The government laid an adequate foundation for the bill of lading under Federal Rule of Evidence 803(6). John Gates, General Manager of Keller's, Inc., testified that it is Keller's responsibility to receive,

prepare for shipment, and ship all of Panasonic's goods as per their instructions; that Keller's keep records in the ordinary course of business; that entries made on these records are made at or near the time in which events are reflected on the records; and that as General Manager of Keller's he is the custodian of records. Gates further testified that the bill in question was prepared by one of Keller's employees at the direction of Panasonic. When the evidence is viewed as a whole, including the detailed elaborations as well as Gate's general statements concerning record-keeping, we are satisfied that the requirements of the rule have been met. The business records exception does not require that the custodian explain the record-keeping procedures, and the cases cited, *Liner v. J.B. Talley & Co.,* 618 F.2d 327, 329 (5th Cir.1980), *United States v. Berkowitz,* 429 F.2d 921, 927 (1st Cir.1970), do not support appellants' contention. The trial court did not abuse its discretion in admitting the bill of lading.

### IV.

Appellants argue that the jury should not have been provided with transcripts to assist them while listening to tape-recordings which were played for them during the Government's case-in-chief. They argue that the use of the transcripts was prejudicially cumulative because there was no problem with the sound recording and witnesses testifying to the accuracy of the tapes generally identified the speakers in the recordings.

In *United States v. McMillan,* 508 F.2d 101 (8th Cir.1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975), we set forth procedures for using transcripts of voice recordings, and stated:

[I]t may be appropriate, in the sound discretion of the trial judge, to furnish the jurors with copies of a transcript to assist them in listening to the tapes. In the ordinary case this will not be prejudicially cumulative .... *McMillan, supra,* 508 F.2d at 105–06.

The procedures used during the trial were in complete accordance with *McMillan.*

We cannot conclude that the district court abused its discretion in allowing use of the transcripts when the tapes were played. *See, United States v. Mansaw,* 714 F.2d 785 at 790 (8th Cir.1983). It is evident that on some of the tape recordings there were five different speakers at any given time. The trial court was within its discretion to allow the jury to use the transcripts to identify the speakers instead of risking jury confusion from having the tape stopped between speakers in order to identify the next speaker.

## V.

Appellants contend that the trial court erred in denying their motions for severance because the defendants were prevented from giving possible exculpatory testimony on behalf of the codefendant. They also argue that the evidence presented was so voluminous and conflicting that it could only serve to confuse the jury.

The principles which must be applied here were described in *United States v. Bostic,* 713 F.2d 401 at 403 (8th Cir.1983):

> persons charged in a conspiracy should be tried together, particularly where proof of the charges against the defendants is based upon the same evidence and acts. Severance will be allowed upon a showing of real prejudice to an individual defendant. However, the motion to sever is addressed to the discretion of the trial court, and a denial of severance is not grounds for reversal unless clear prejudice and an abuse of discretion are shown.

Appellants have failed to demonstrate any real prejudice resulting from their joint trial. Henneberry's counsel stated in an offer of proof that he expected that if Youngerman were called to testify he would testify that he has no knowledge, or any understanding of who Mr. Henneberry is, had never met him before, and had reached no agreement with him. Beyond this statement of expectancy, however, there is no evidence to substantiate the claim that Youngerman would testify along the lines of the offer of proof; when voir dired outside the hearing of the jury, Youngerman simply refused to answer any questions tendered by counsel for Henneberry, claiming the fifth amendment. As this court reiterated in *United States v. Singer,* 660 F.2d 1295, 1306 (8th Cir.1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982), a defendant must show something more than the fact his chances for acquittal would have been better had he been tried separately. He must affirmatively demonstrate the joint trial prejudiced his right to a fair trial.

Finally, we do not agree with appellants' claim that the evidence was so voluminous and conflicting that it could only serve to confuse the jury. We believe that the proof of the charges against defendants was based upon the same evidence and the same acts and thus favored a joint trial. The trial court did not abuse its discretion in denying the defendants' motion for severance.

## VI.

Appellants further contend that the trial court erred in refusing to grant a mistrial when counsel for the Government referred to other criminal matters, specifically, insurance jobs and cars. Appellants point to two passages in particular and to the prosecution's questioning of witnesses in general. After reviewing the particular passages, we conclude that the government did not refer to other crimes committed by either of the defendants. If any prejudice did accrue to the defendants as a result of either passage, it was cured when the district court instructed the jury that the defendants were not on trial for any acts or conduct not charged in the indictment.

Appellants' generalized objection to the Government's questioning of witnesses is without merit. We have carefully reviewed the record and we find no allusions to prior misdeeds. The district court properly overruled the defendants' objections and their requests for a mistrial.

## VII.

Finally, appellants contend that the district court erred in refusing to admit into

evidence section 1081 of Title 49, C.F.R., which defines a "bill of lading." The court refused to take judicial notice of this section ruling that 18 U.S.C. § 659 was the controlling law. We agree, and find no prejudicial error in the district court's refusal to admit the regulation into evidence.

We have carefully reviewed all the appellants' claims of error and are convinced that they are without merit. The judgments of conviction are therefore affirmed.