UNITED STATES of America, Plaintiff-Appellee,

v.

Burton R. SIGNER, Defendant-Appellant.

No. 72–1978.

United States Court of Appeals, Sixth Circuit.

Argued April 13, 1973.

Decided July 25, 1973.

John Kennedy Lynch, Cleveland, Ohio, for defendant-appellant.

Ralph Winkler, Asst. U. S. Atty., for plaintiff-appellee; William W. Milligan, U. S. Atty., Cincinnati, Ohio, on brief.

Before WEICK, Circuit Judge, and CECIL and O'SULLIVAN, Senior Circuit Judges.

WEICK, Circuit Judge.

Signer, a Cincinnati attorney and building and loan association executive, was charged in a two-count indictment with attempted income tax evasion and with making and signing a false income tax return, in violation of 26 U.S.C. §§ 7201 and 7206(1). He entered a plea of not guilty, and upon trial before a jury he was found guilty on both counts. He was sentenced to one year and a day imprisonment only on Count I.

The Government's case initially was composed of six specific items of unreported income. During the trial one item was dropped; the five remaining items totaled $58,075.34 and were summarized by the Government as follows:

"SUMMARY OF ADDITIONAL INCOME—1965 .

| ITEM | EXPLANATION | AMOUNT |
|---|---|---|
| 1. | INCOME FROM NEGOTIATIONS FOR RINGGOLD PURCHASE | $10,000.00 |
| 2. | INCOME FROM ACQUISITION OF CONTROL OF RINGGOLD BUILDING AND LOAN | 20,000.00 |
| 3. | INSURANCE REFUNDS DEPOSITED BY DEFENDANT | 1,001.72 |
| 4. | INCOME DERIVED FROM G.G.S. TRANSACTIONS | 9,500.00 |
| 5. | INCOME ON TRANSACTIONS INVOLVING BEECH CORPORATION | 17,573.62 |
| | TOTAL | $58,075.34" |

Signer had been attorney for, and president and director of, Ringgold

Building & Loan Association (Ringgold) since 1963. The board of directors consisted of seven members, each of whom had paid $15,000 for his seat on the board. In 1964 there was disagreement among the board members, and six of them, not including Signer, desired to sell their seats for what they had paid for them.

In December, 1964. Signer met with Edward Guilfoyle and Gene Graff, neither of whom had any previous connection with Ringgold, to discuss a plan to purchase the seats of the other six directors and thereby acquire control of the building and loan association at no cost to themselves.

Under the plan Signer would continue as president, director, and attorney for the building and loan. Guilfoyle and Graff would become directors and secretary and treasurer, respectively. All three would constitute the Executive Committee. Signer was authorized by the group to draw the contract to purchase the seats of the six directors.

The money to pay the six directors who were selling their seats had to be raised within ninety days. Signer arranged for a temporary loan of $42,000 from his friend, Edward Hoemmelmeyer, evidenced by a cognovit note in the amount of $45,000, executed by Signer, Guilfoyle, and Graff and Graff's wife. Signer deposited this money to his checking account. He issued his check to Hoemmelmeyer for $2,500, as payment of advance interest on the loan. On December 30, 1964, Signer wrote his check for $35,000, payable to a trustee for the old directors, and delivered to him that check plus two checks of Graff totaling $10,000, which paid the old directors $45,000. The three, Signer, Guilfoyle and Graff, then assumed control of Ringgold.

In order to obtain money to repay the temporary loan of Hoemmelmeyer and to pay the balance owing to the old directors, a real estate company, Market Realty, was to be organized by Graff with Signer drawing the incorporation papers. Until the corporation was set up, Graff was to operate in his own name. He was to acquire a large number of parcels of real estate, obtaining loans therefor from Ringgold, in excess of the cost of the real estate, and the overage was to be used to pay off the old directors. Title to the properties so purchased was taken in the name of nominees, who consisted of employees of Graff and friends who would execute notes and mortgages to Ringgold and receive checks for the proceeds of the loans, which checks they would endorse to Graff or to Market Realty, without even looking at the face of the checks.

Between January 1, 1965 and March 3, 1965, seventeen checks of Ringgold, signed by Signer, totaling $99,722.87, for these overloans, were deposited in the bank account of Graff or Market Realty. In addition, three other Ringgold checks totaling $30,341.45, for overloans, were deposited in Graff's checking account.

On January 11, 1965, Graff gave to Signer his check for $2,657.14, which Signer deposited in his checking account, making a notation that $2,500 of the deposit was repayment of advance for interest payment which Signer had paid Hoemmelmeyer. Signer took a deduction on his 1964 income tax return for the interest payment to Hoemmelmeyer, although he had been reimbursed for this item by Graff prior to the filing of that return.

On February 11, 1965 Graff issued his check to Signer for $45,000 "for purchase of the Bldg. & Loan", which Signer deposited in his checking account "to be used to repay loan with Ed Hoemmelmeyer." Signer then issued his check to Hoemmelmeyer for $42,000 to repay the loan, which left a balance of $45,000 owing to the old directors.

On March 24, 1965 Graff drew a check for $35,000 payable to G.G.S. Inc., a corporation owned and controlled by the three associates, and drew another check for $10,000 payable to Ringgold. G.G.S. Inc. issued its check to Ringgold

for $35,000, and Signer then issued Ringgold's check for $45,000 to pay off the old directors and a certificate of deposit that had been issued by Ringgold pursuant to the purchase agreement.

Item 1 in the Summary, showing $10,000, represents the amount received by Signer from Graff out of the overloans in excess of the sums paid out by Signer. Signer claims that when he purchased the stock of Graff in G.G.S. Inc. and paid him $10,000, Graff signed a general release discharging him (Signer) of all claims owing to Graff, including the $10,000 in the Summary. The trouble with this rather ingenious contention is that Graff could not relieve Signer of his liability for the receipt of overloan funds diverted from Ringgold, or of his duty to report the $10,000 so received, as income on his 1965 income tax return.

Item 2 in the Summary is an allocation of income resulting from the acquisition of control of Ringgold. Six seats on the board of directors cost $90,000, or $15,000 per seat. Seven seats would cost $105,000; and the value of one-third control would be $35,000. Crediting Signer with one-seventh control, or $15,000, already owned by him, leaves the cost of additional control acquired by Signer as $20,000. That the control was valuable to Signer is evidenced by the fact that he was able to acquire it without resorting to use of his own funds. Also, he was able to sell property in which he and his wife were interested, to Ringgold, at a large profit.

Item 3 in the Summary, $1001.72, represents the refund of premiums on life insurance policies taken out by Market Realty on the lives of Signer (his wife was beneficiary), Guilfoyle, and Graff, and by Beech Corporation on the life of Signer (with his wife as beneficiary). Signer deposited the insurance premium refund checks in his checking account. Market Realty and Beech Corporation had paid the premiums on these policies. Signer received the refund of premiums on the policies on his own life; he had no authority to receive and retain the refund of premiums on the policies of Graff and Guilfoyle.

Item 4 in the Summary, $9,500. Signer admitted receiving $10,000 from G.G. S. Inc., but he claims that he repaid $1,000 thereof by check to Graff, and that the balance was part of a check of Hickman Realty Company to G.G.S. Inc. There was evidence, however, that Signer did make a loan of $1,000 to Graff, but that Graff repaid the loan in full. The check of Hickman Realty to G.G.S. Inc. for $50,000 was the purchase price of shares of G.G.S. Inc. stock. Hickman Realty was owned and controlled by Signer and his wife.

Item 5 in the Summary: Beech Corporation, $17,573.62. Beech Corporation during 1965 was performing construction work on the building which housed Ringgold. The work was financed by a construction loan made by Home Federal Savings & Loan to Hickman Realty Company, the then owner of the property. The loan was secured by a note and mortgage executed by Hickman, which note was also signed by Signer. A false affidavit was filed with Home Federal indicating that $27,031.86 of work had been performed by Beech Corporation, whereas in truth and in fact only $7,000 of work had been performed. As a result of this false affidavit, Home Federal issued its check to Beech Corporation and Hickman Realty for $27,031.86, and of this sum Signer received the amount of $17,573.62. He claimed that this amount was not income to him because he was personally liable on the Home Federal note. The trouble with this contention is that Home Federal was paid the full amount due on its note and mortgage when Hickman Realty sold the property to Ringgold in 1965, at a large profit. There was nothing in the papers to indicate that Home Federal or Hickman was lending this sum to Signer. On the contrary, in the 1965 income tax return of Hickman Realty its basis for the property included the entire cost of the Home Federal mortgage

loan without any credit for the moneys paid under the false affidavit.

■ Among his defenses, Signer contends that his auditor prepared and signed his income tax return. The auditor, however, was not furnished full information by Signer; the auditor knew nothing of the Ringgold overloans.

■ Signer claims error in the denial of his motions for judgment of acquittal. While the evidence in some particulars is conflicting, we are of the opinion that there was substantial evidence to support the verdict of the jury. There was evidence of a substantial understatement of tax in the return which Signer filed; he had knowledge that the return was incorrect, and the omissions were wilful. Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943); United States v. DeNiro, 392 F.2d 753 (6th Cir.), cert. denied, 393 U.S. 826, 89 S.Ct. 89, 21 L.Ed.2d 97 (1968).

In the consideration of a motion for judgment of acquittal the trial court must consider the evidence, as well as the inferences to be drawn therefrom, in the most favorable light to the Government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Collon, 426 F.2d 939 (6th Cir. 1970).

■ Signer contends that the Court erred in not withdrawing entirely from consideration by the jury, the evidence concerning his profit of about $100,000 in the sale of a building to Ringgold in October, 1965. This was item 6, and was included in the indictment, but during the trial the Government withdrew that item. The Court was careful to instruct the jury that the evidence could not be considered as additional income in 1965, but could be considered only for such "weight as you see fit to give it under such questions as wilfulness and intent of the defendant, if any, and the general relationship, if any, with the Ringgold Association." It was an item of self-dealing, and was relevant on the issue of control which Signer and his associates purchased with funds diverted from Ringgold. Moore v. United States, 412 F.2d 974 (5th Cir. 1969).

Signer argues that there was no proof that Ringgold lost any money on the overloan mortgages, and intimates that they were paid in full. It is clear to us that Ringgold did lose the funds which were diverted on these overloans and which totaled more than $130,000.

■ Signer contends that he was deprived of a fair trial because of prejudicial remarks made by the Assistant United States Attorney in his opening statement to the jury and in the opening and closing arguments to the jury of the United States Attorney.

The opening statement of the Assistant United States Attorney contained the following language:

> "You will find that after hearing all the evidence in the case, ladies and gentlemen, that Mr. Signer could not have done a more effective job of getting money out of Ringgold Building and Loan if he had went out and bought a mask, got an acetylene torch, gone in there one night and blown the vault door open."

Objection was made by counsel for defendant, which objection was sustained by the Court, and the jury was instructed to disregard the statement.

Signer was on trial for income tax evasion and not for diversion or misapplication of building and loan funds. The statement was improper and, in our judgment, very prejudicial.

■ The purpose of the opening statement of the prosecution is to outline broadly the facts of the case so that the jury will understand the evidence as it unfolds. The opening statement should not be used to poison the minds of the jury against the defendant before the jury has heard the evidence, or to improperly prejudice the defendant in the eyes of the jurors, or to destroy his credibility. Government of Virgin Islands v. Turner, 409 F.2d 102 (1st Cir.

1969); Leonard v. United States, 277 F.2d 834 (9th Cir. 1960).

But this was not all. In the United States Attorney's opening argument to the jury, he recited a fable which he composed, with apologies to Aesop, using Signer as the fox in the chicken coop.[1]

As if this were not enough, in his closing argument to the jury the United States Attorney displayed to the jury a blown-up cartoon of a "Boss Tweed Tammany Ring", measuring four by four feet, and showing a number of disreputable looking characters, each pointing a finger at the one standing next to him. Under the cartoon, in large letters appeared the following: "Who Stole the Money?" "It was Him." This cartoon was not in evidence.

In his remarks during final argument, the United States Attorney told the jury:

"I like political cartoons, and I hope you won't consider it humorous because I don't think it's humorous; I think it illustrates the point, if I show you a cartoon for the Last Century Cleveland, which was the New York Tribune, and it was to get a lot of money of New York—

"MR. LYNCH: May I see that first.

"MR. MILLIGAN: Go right ahead, take a look.

"'Who stole the people's money:' They have a ring, everyone pointing to the man next to him.

"Who took the money from the Ringgold? Was it Graff? Was it

---

1. The following excerpt from plaintiff's opening statement appears at pages 1324 to 1326 of the transcript:

"The testimony indicates that the original plan to take over the Ringgold was hatched by Signer, Graff and Guilfoyle at the Fox and Crow. I have been thinking about that word 'Fox'. I think it's sort of suggestive in this particular case. My thinking after hearing all the testimony is that putting Burt Signer in charge of the building and loan was like putting a fox in charge of the hen house. Now, with that thought in mind, I have written a little fable which I will share wih you with some apologies to Mr. Aesop.

"One upon a time there was a farmer named Ringgold who had a fine flock of chickens. One day a certain fox stopped by the farm and applied for the job of guarding the chickens. The farmer was impressed by his credentials and put the fox in charge of the hen house.

"The next morning four of the chickens were missing. At this time the fox called upon his accountants, who happened to be named Milton Foreman, to conduct an audit. Mr. Foreman noticed the missing chickens and listed them under his chicken-suspense account, meaning he didn't know what happened to them. After consulting with his client, the fox, he made adjusting entries—

"MR. LYNCH: Objection.

"MR. MILLIGAN: —listing the missing chickens under the chicken-exchange

account, meaning someone doubtless would come along and replace the chickens, and two under his chicken-loan account.

"Farmer Ringgold was also concerned, so he called his accountant, John Shriver, to conduct an independent audit. Shriver also noted the chickens were missing while in the fox's custody, and he recorded the matter under his chickens-payable-fox account. He asked the fox about it, who told him, 'One, there weren't any chickens missing; and two, if there were any, he didn't owe anybody any chickens.' Accountant Shriver couldn't figure it out so he didn't complete his audit.

"The insurance company, which had insured the chickens, was also concerned and sent out an investigator, Don Hunsche, to inquire. Well, he reported the missing chickens under unscheduled items, meaning that there were some unexplained losses.

"The government was also concerned and sent out Special Agent Robert Ruwe, who noticed some feathers under the roost and also noticed some blood up in the loft where the fox had been staying, and he had his suspicions, but his job was concerned with taxes. So he listed the affair under understated chickens.

"Now the moral of this particular story, this particular fable, is that the fox ate the chickens and all the accountants in town couldn't change it."

**400**

Guilfoyle? Was it Signer?" (Record, 1378–9).

As before stated, Signer was on trial for income tax evasion only, and it was not proper to attempt to try him for something else; nor is it proper to appeal to the passions and prejudices of the jurors. Cincinnati is well-known as a building and loan center, with a large number of associations doing business in the city, which associations without a doubt had many depositors. The depicting of Signer as a thief looting a building and loan association, could not help but prejudice him in the eyes of the jury.

It should be pointed out further that the factual issues in this case were complex and were admitted by the prosecution to be confusing. In this posture, the defendant had the right to have the issue of whether he wilfully attempted to evade income taxes, determined dispassionately. Signer, along with his associates, did divert funds from the building and loan but he could not properly be likened to a thief or a masked burglar.

■ Even though the cartoon was not objected to by the defendant, we may notice it as a plain error affecting the substantial right of the defendant to a fair trial. Rule 52(b), Fed.R.Crim.P.; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Benson, 389 F.2d 376 (6th Cir. 1966), cert. denied, 391 U.S. 903, 88 S.Ct. 1652, 20 L.Ed.2d 418 (1968).

Because of prejudicial remarks made by the Assistant United States Attorney in his opening statement to the jury, and prejudicial remarks of the United States Attorney in his opening and closing arguments to the jury, including the exhibition of the cartoon to the jury, all of which in our opinion operated to deprive the defendant of a fair trial, the judgment of conviction is reversed and the case is remanded for a new trial.

In view of this disposition of the case, it is not necessary to discuss other errors asserted.

Reversed.