UNITED STATES of America, Appellee,

v.

**Morris Junior JOHNSON, Appellant.**

UNITED STATES of America, Appellee,

v.

**Charles David BAILEY, Appellant.**

UNITED STATES of America, Appellee,

v.

**Leonard Allen BREEDLOVE, Appellant.**

UNITED STATES of America, Appellee,

v.

**Lee H. MORGAN, Appellant.**

Nos. 84–2002, 84–2048, 84–2049 and 84–2050.

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1985.

Decided June 28, 1985.

Rehearing Denied in No. 84–2050 Aug. 2, 1985.

Philip Moomaw, Michael Baker and Donald Cooley, Springfield, Mo., for appellants.

Michael Jones, Asst. U.S. Atty., Springfield, Mo., for appellee.

Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BOWMAN, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

A brown 1981 Cadillac was stolen from a dealership in St. Louis, apparently given new vehicle identification numbers in southwest Missouri, and falsely titled in Oklahoma. These events led to the convictions of Morris Junior Johnson, Charles David Bailey, Leonard Allen Breedlove, and Lee H. Morgan of conspiring to transport in interstate commerce stolen property valued at $5,000 or more, and knowingly concealing and transporting such property from Oklahoma to Missouri in violation of 18 U.S.C. §§ 2, 371, and 2314–2315 (1982). On appeal the primary issues are whether the district court[1] erred in rulings concerning the defense that the property lost its stolen character when a federal agent examined it, in admitting evidence of similar crimes, in overruling various objections relating to the admission of taped conversations, and in ruling an assortment of other procedural matters. Having carefully considered all of these arguments, we affirm the convictions of each of the appellants.

The events giving rise to the convictions are best understood with some background on the role that "retagging" plays in car theft organizations, which was explained at trial by FBI Agent Tom DenOuden. A salvage vehicle and title are purchased and the small metal vehicle identification number (VIN) plate[2] is removed from the vehicle. The salvage title is then processed through a state with lax titling require-

---

1. The Honorable Russell G. Clark, Chief United States District Judge for the Western District of Missouri.

2. Every motor vehicle when manufactured is assigned a vehicle identification number, which is stamped on a small metal plate and affixed to the dashboard. The VIN has seventeen characters (numbers and letters), but only the last six

numbers identify a particular car. The first eleven characters identify the body style, engine size, model, and other features. By law, only once every thirty years can a VIN be reused. For the sake of brevity, we will use only the last four digits for subsequent references to the VIN's involved here.

ments so that a non-salvage title is issued. This processing is termed "title washing." Shortly after the salvage vehicle is obtained, a car is stolen that matches the vehicle and washed titled as to engine size, upholstery, color, and accessories. The characters on the salvage VIN and washed title will thus closely correspond to the appearance of the stolen car. The true VIN is removed from the stolen car and replaced with the salvage VIN. Derivative VINs are ground off the motor, transmission, and frame, and new derivative numbers that match the salvage VIN are stamped over the old numbers. Once a stolen car has been retagged the stolen car appears to be legitimate.

FBI Agent Roy Christopher testified that in 1980 the FBI began an undercover operation located in the Cape Girardeau area. Operating under a used car dealer's license, agents purchased and resold salvage vehicles. In November 1981, the agents acquired as salvage a burned 1981 Cadillac. They removed the VIN plate, for which Morgan had offered to pay $4,500. Christopher sold Morgan the VIN plate 1G6AD6992B9161884 (1884), and the matching Louisiana title, insurance company power of attorney, and bill of sale. Morgan paid Christopher $4,000 cash and promised to pay the balance later.[3] Christopher testified that between October 1980 and March 1982 he had sold Morgan twenty-nine VIN plates and corresponding titles at prices ranging from $800 to $4,500 apiece. Further testimony and stipulations showed that on February 9, 1982, five days after Morgan purchased the salvage 1981 Cadillac VIN plate, a brown 1981 Cadillac Sedan DeVille, VIN 1G6AD6990B9104034 (4034) was stolen from Lindburg Cadillac Company, St. Louis.[4]

Meanwhile, the FBI had set up another undercover operation in Lebanon, Missouri.

Ronald Schlup, a paid informant, and FBI Agent Richard Rindt were running a salvage yard. Their goal was to expose retaggers by selling them salvage that would presumably be used to refit stolen cars. On February 18, 1982, defendants Breedlove and Bailey met with Schlup at his salvage yard. Breedlove asked Schlup to pick up a 1981 Cadillac Sedan DeVille from a Surf 99 service station in Springfield, explaining that the police had taken the car from a motel and impounded it. Breedlove gave Schlup a Louisiana title and told him to tell the police that the car was owned by a Louisiana car dealer. Schlup was to say that he was to repair the car for the owner. Breedlove and Bailey paid Schlup $100 for this service. Schlup agreed to deliver the car to a rest area on I–44 between Springfield and Lebanon and to call Commercial Motors upon his arrival.

DenOuden instructed Schlup to do as Breedlove and Bailey had directed. On February 19, 1982, Schlup drove his wrecker to Springfield and met with the agent. They went to the Springfield Police Department and secured the release to Schlup of the Cadillac. Schlup signed the release and used the name "Commercial Street Motors, Monroe, Louisiana," as instructed by Breedlove. They proceeded to Surf 99, paid the storage fee for the car, and towed it to another local service station. DenOuden inspected and photographed the car and Schlup stamped the number "511" on the frame rails near the gas tanks.[5] Schlup then drove the Cadillac to the rest area and phoned Bailey at Commercial Motors. Bailey told Schlup that "they" would be out to get the car; Johnson and another man soon appeared at the rest area. Johnson drove away in the Cadillac.

On February 25, 1982, Breedlove told Schlup that a salvaged yellow 1981 Sedan

---

3. Morgan also told the agent he needed some "'81 stickers," also called "Nader" stickers. These are federal safety labels that are affixed to the driver's side door and contain information about the vehicle, including the VIN. Blank stickers are used by retaggers on stolen vehicles.

4. The parties stipulated that the value of this Cadillac, throughout the dates in the indictment, was in excess of $5,000.

5. The VIN on the car (1884) matched the plate that Christopher had sold to Morgan, although DenOuden was evidently unaware of this fact when he inspected the car.

DeVille was going to be brought over to Schlup's salvage yard. Breedlove also told Schlup how to "wash" car titles through the State of Oklahoma, that is, to remove the term "salvage" from the title by securing a new Oklahoma title. Later that day, Schlup met with Bailey and Johnson. Bailey told Schlup that "they" would bring in the yellow DeVille that Breedlove had referred to earlier. That evening, Johnson, driving Breedlove and Bailey's two-car hauler, arrived at the salvage yard and unloaded two cars, one of which was a yellow 1981 Sedan DeVille. The next day Breedlove and Bailey returned to Schlup's salvage yard. They told Schlup to remove the VIN plate and the left door of the yellow Cadillac. Schlup was to keep the remainder of the vehicle. The VIN plate, number 1G6AD6998B9192699 (2699), and left door were delivered the following day. A few days later, Bailey told Schlup that the brown Cadillac picked up in Springfield had been sent to Oklahoma. One month later, Breedlove told Schlup that that brown Cadillac was a "sting" car. Breedlove asked him to cut up or "chop" the Cadillac and said that he had a lot of money invested in the car. Following FBI instructions, Schlup refused.

On April 3, 1984, Schlup again met with Breedlove and Bailey at the salvage yard. Breedlove asked him to travel to Tulsa and retrieve the brown Cadillac that Schlup had picked up in Springfield. Breedlove and Bailey told Schlup he was to ride with Carl Griffin. The next evening Griffin drove Schlup to Tulsa to pick up the brown Cadillac. Schlup delivered the car to Bailey and Johnson near Lebanon.

The government introduced evidence of the salvage chain of title for the yellow Cadillac. These records showed that the salvage Cadillac was transferred on February 26 from C & F Auto Sales to "Larry Wilson." On April 14, 1982, it was assigned from Larry Wilson to Polk County Motors, Johnson's dealership. The Texas salvage title was surrendered to Oklahoma and an Oklahoma title was issued on May 13, 1982 in the name of Larry Wilson.

Thomas Arnold, a Lebanon car dealer, testified that in April 1982, Breedlove approached him about washing a title in Oklahoma. After twice refusing these requests, Arnold agreed. He was given the Texas salvage title and the Texas Dealer's Reassignment of Title to take to Oklahoma. Arnold testified that the name "Larry Wilson" was on the dealer's reassignment when that document was given to him. He added the dealer's name and address of "Polk County Motors, Bolivar, Missouri," and signed the name "Larry Wilson" to the document. Arnold went to a titling office in Oklahoma, turned in the Texas papers, and applied for an Oklahoma title for a 1981 DeVille Cadillac. He signed the title application as "Larry Wilson," paid the fee, and was issued a new Oklahoma title bearing the false name. Arnold returned to Commercial Motors and delivered the title to Breedlove and Bailey. He refused their request that he sign the reassignment portion of the title as "Larry Wilson." Arnold also said that he did not sign Johnson's name, or his business name "Polk County Motors," on the back of the new Oklahoma title. Bailey paid Arnold $225 for the cost of the title.

On May 27, 1982, the "washed" Oklahoma title and a brown 1981 Cadillac Sedan DeVille bearing VIN 2699 were transferred to Bill Tandy Motors, Rolla, Missouri. Although the reassignment portion of the title showed the transferor to be Johnson, doing business as Polk County Motors, Tandy testified that actually he had dealt with Kenny Smith at Smith's car lot in Lebanon. Tandy was told, however, that he was buying the car from Polk County Motors.

It was stipulated that a brown 1981 Cadillac, VIN 2699, was eventually recovered on February 4, 1983, from a subsequent buyer in Lake of the Hills, Illinois. Testimony from various witnesses showed the brown 1981 Cadillac stolen from the St. Louis dealership, VIN 4034, was the vehicle recovered in Illinois. A special agent with the National Automobile Theft Bureau, trained in motor vehicle identification and

recovery, examined the Cadillac recovered in Illinois. He found that the true confidential numbers (derivatives of the VIN) had been ground off and that derivatives restamped to correspond to the 2699 VIN plate. He found that the frame had been removed from the body, a step necessary to removing the confidential numbers from the frame. The agent found the number "34" written in grease pencil under the hood, which he felt indicated the last two digits of the car's true VIN. Earlier testimony from a General Motors official showed that the Cadillac stolen from St. Louis (4034) would have left the factory with the number "34" written in yellow or white under the hood and on the inside of the fender.

FBI Agent Gregorio Rodriquez from Chicago was present when the "34" was found beneath the hood. Rodriquez obtained from Lindburg a complete description of their stolen Cadillac. He testified that the recovered Cadillac matched the one stolen from Lindburg in significant details, including a special radio, three of the tires, interior, a limited slip differential and vinyl roof. A General Motors official testified that although 150,915 Cadillac Sedan DeVilles were manufactured in 1981, no other Cadillac was exactly like the one delivered to Lindburg. DenOuden examined the Cadillac in Chicago on June 7, 1984, and photographed the "511" stamped on both frame rails. The numbers and their location corresponded to those stamped by Schlup on February 19, 1984 in Springfield.

Special Agent Rindt testified that he had sold blank titles to Breedlove and Bailey in exchange for salvage titles. Rindt sold Breedlove five titles at prices from $300–$500. Four titles were sold to Bailey for $500 apiece. Rindt also provided three titles to Breedlove and Bailey together, at a price of $500 each. On all of these titles, the mileage and name were adjusted or shown according to the defendants' specifications. According to Rindt, Breedlove wanted VIN plates to be removed from

salvage cars for placement on stolen cars. Breedlove also wanted the left doors, as well as the frames, motors, and transmissions (because they had numbers stamped on them) to use as parts on stolen cars. Between May and December, 1982, the agent discussed such procedures with Breedlove and Bailey over fifty times. Breedlove also asked the agent to chop or cut up stolen cars in order to sell the parts. Rindt had similar conversations with Bailey.

On December 20, 1982, a search of Bailey's residence produced four blank Kansas titles. A search of Commercial Motors produced blank vehicle bills of sale from the State of Louisiana. Also found were two legal pads showing dates of payments and expenses between Johnson's business and Breedlove and Bailey, including an expense of $100 to Johnson's business on the date the Cadillac was stolen from St. Louis. It also showed a payment to Tommy Arnold of $225. Also recovered in the search of Commercial Motors were blank federal certification ("Nader") stickers.

All four defendants were convicted of conspiring to transport in interstate commerce stolen property valued at $5,000 or more and knowingly concealing stolen property valued at $5,000 or more. In addition, Bailey, Breedlove, and Johnson were convicted of transporting stolen property valued at $5,000 or more from Oklahoma to Missouri and transporting in interstate commerce a falsely made certificate of title. The jury acquitted the defendants on the charge of transporting stolen property from Missouri to Oklahoma.

## I.

▪ The defendants contend that the brown Cadillac lost its "stolen" character when it was diverted by DenOuden and Schlup on February 9, 1982. Thus, they argue, the district court erred in denying their motions for acquittal and in refusing to give an instruction [6] explaining this de-

6. The defendants requested the following instruction:

When law enforcement officers gain actual, exclusive physical possession of stolen property

fense theory. A denial of a motion for acquittal must be upheld if, examining the evidence in a light most favorable to the government, there is substantial evidence to support the conviction. *United States v. Lee,* 743 F.2d 1240, 1250 (8th Cir.1984). A criminal defendant is entitled to have the jury instructed on a defense theory if a timely submission is made of an instruction that correctly states the law and is supported by the evidence. *United States v. Fay,* 668 F.2d 375, 377 (8th Cir.1981).

We considered a "stolen character" argument in *United States v. Henneberry,* 719 F.2d 941 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1612, 80 L.Ed.2d 141 (1984). This court held acquittal was not required where FBI agents had simply observed and inventoried stolen property. *Id.* at 947–48. We catalogued a number of federal decisions discussing this issue and stated:

> Although police hold stolen goods in trust for the true owner, *United States v. Cawley,* 255 F.2d 338, 340 (3d Cir. 1958), courts have not held the police to a duty immediately to take possession of goods known to be stolen. *United States v. Dove,* 629 F.2d 325, 327 (4th Cir.1980). A distinction has emerged between the *actual recovery* of stolen goods and the mere observation of those goods for purposes of apprehending persons who take possession of them.

719 F.2d at 947 (emphasis added) (citations omitted).[7]

The inconsistency in decisions applying this distinction between surveillance and actual recovery was noted by the court in *United States v. Dove,* 629 F.2d 325, 327,

328–329 (4th Cir.1980). Two of the decisions give appellants their strongest support. In *United States v. Cawley,* 255 F.2d 338 (3d Cir.1958), and *United States v. Monasterski,* 567 F.2d 677 (6th Cir.1977), thieves were arrested with stolen property and their cooperation secured in completing the delivery to a third party. In *Cawley,* postal inspectors had taken packages to the post office and checked their contents. In *Monasterski,* Conrail police and FBI agents marked stolen tires and placed some of them in a van they had supplied. In both cases, convictions were reversed on the ground that the property had lost its stolen character when possessed by law enforcement officials. In *Cawley,* the court assumed that the postal inspectors recovered the packages and the only dispute was whether the inspectors should have been deemed agents of the mail's true owner. 255 F.2d at 340. *Cawley* and *Monasterski* are both distinguishable from this case in that they involved the arrest of thieves in possession of the stolen property, with officers utilizing and directing those thieves to deliver the property to a subsequent purchaser.

The government, on the other hand, relies on factually similar cases reaching a different conclusion. In *United States v. Egger,* 470 F.2d 1179 (9th Cir.1972), *cert. denied,* 411 U.S. 954, 93 S.Ct. 1931, 36 L.Ed.2d 416 (1973), a bank robber cooperated with the FBI in delivering stolen money to the defendant. The money was produced in the presence of FBI agents, who counted it and recorded the serial numbers. The defendant argued that these actions constituted recovery of the money by law

---

with knowledge of its stolen nature, the law enforcement officers hold the recaptured stolen goods in trust for the true owner, and the character of the goods as stolen is lost.

Law enforcement officers are, however, under no duty to take stolen property into their actual, exclusive physical possession at any particular time.

Thus, if you find from the evidence, that the Federal Bureau of Investigation on February 19, 1982 had actual exclusive, physical possession of the 1981 Cadillac with knowledge of its stolen nature, you may not find any defendant guilty of any offense alleged to have occurred after

that date that requires, as an essential element of the offense, that the goods be stolen.

**7.** This rule has evolved from English cases in the last century holding that goods recovered by their true owner lose their stolen character. *See, e.g., Regina v. Schmidt,* 1 Cr.Cas.Res. 15 (1866); *Regina v. Dolan,* 29 Eng.Law & Eg. 533 (1855). Courts in this country added the principle that recovery by law enforcement officials may be presumed to be recovery by the owner's agent. *See, e.g., People v. Rojas,* 55 Cal.2d 252, 10 Cal.Rptr. 465, 358 P.2d 921 (1961).

enforcement officials. The court of appeals disagreed, concluding that the agents had never assumed " 'actual, physical possession' of the stolen property." *Id.* at 1181. Rather, "these actions were performed as a form of observation and surveillance rather than as possession on behalf of the rightful owner." *Id.*

This issue was more recently considered in *United States v. Muzii,* 676 F.2d 919 (2d Cir.), *cert. denied,* 459 U.S. 863, 103 S.Ct. 139, 74 L.Ed.2d 118 (1982). Two detectives working undercover held themselves out as owners of a trucking company to uncover cargo thefts. They allowed criminals to use their trucking company's warehouse as a "drop" for stolen wares. On two occasions, thieves stored goods in the warehouse for approximately one day before delivering them to buyers. Appealing a conviction for receiving stolen goods, one of the buyers asserted that the goods had lost their stolen character by being placed in the undercover operation's warehouse. The court rejected this argument, concluding that

> the brief custody of the goods by the detectives at the trucking company did not amount to "recovery" of the drugs for their rightful owner and eliminate the stolen character of the goods. Rather, the use of the company's facilities as a "drop" * * * merely facilitated surveillance of the unlawful transaction and enabled the detectives to apprehend the ultimate purchaser. The detectives did not convert their limited role of observation into "recovery" of the stolen goods, since at no time did they exercise control over the drugs on behalf of the rightful owner * * *.

*Id.* at 923.

The defendants and the government both rely on *United States v. Dove,* 629 F.2d 325 (4th Cir.1980). The FBI set up an undercover used car lot operated by an informant to investigate trafficking in stolen cars. Using FBI funds, the informant pur-

chased a stolen car. The car remained on the operation's lot for a month and was sold. The informant also assisted a thief in driving stolen bulldozers onto trailers. The defendants argued that the car and bulldozers had lost their stolen character because of the control that the FBI had exercised over the articles through its undercover informant. The court agreed that the car had lost its status as stolen because it was in the "actual and exclusive possession" of the FBI while it sat on the lot for a month. *Id.* at 328. Nevertheless, the court declined to find that the informant's participation had deprived the bulldozers of their stolen character. The reason was that the informant had assisted the theft as part of the thieves' criminal design, not with the purpose of recovering them for the true owners. The court characterized the conduct as merely a "form of observation." *Id.* at 329.[8]

Insofar as these decisions differ, we believe that *Dove* and *Muzii* are better reasoned in analyzing the distinction between recovery and surveillance. By focusing on whether law officers intend to recover contraband, they confine this defense to its historic origins.

 In ruling on the acquittal motion, the district court found that DenOuden did not intend to take custody or exclusive possession of the vehicle; he merely delayed its delivery for inspection and identification purposes. When the Cadillac was taken to the Sinclair Station for examination, including the taking of photographs and the stamping of an identification number, DenOuden was not certain that the vehicle had been stolen. He had strong suspicions that it was a "retagger," but an initial computer check at the highway patrol office had not confirmed his hunch. DenOuden testified that he entertained a desire to seize the vehicle. He had not made up his mind, however, and after checking with his superiors, he determined that a seizure of the vehicle at the time

---

**8.** A major issue in *Dove* was whether recovery by an informant rather than a police officer could be deemed recovery by the owner. 629

F.2d at 329 (Russell, J., dissenting). The defendants here, however, base their recovery defense solely on an FBI agent's conduct.

would jeopardize the undercover operations that had taken some time to establish and accordingly decided that the vehicle should not be seized. His ultimate decision supports the district court's conclusion that DenOuden's action was for inspection and identification purposes only. When this evidence is examined in a light most favorable to the government, a jury could reasonably decide that the vehicle did not lose its stolen character. Thus, the court did not err in denying the motions for acquittal.

■ The instruction request presents a closer issue. The instruction submitted by the defendants allows a conclusion in their favor based only on a finding that the FBI held actual and exclusive possession of the car. Read broadly, *Monasterski* may support the principle that mere possession by law enforcement officers will deprive goods of their stolen character regardless of whether officers intended to recover the property. Nevertheless, we believe the court gave insufficient consideration to the distinction between actual recovery and mere observation or surveillance as recognized in *Henneberry*. We also think *Muzii* and *Dove* are persuasive in scrutinizing whether police conduct reflects a purpose to recover the goods as opposed to a desire to facilitate apprehension of other criminals. *See Muzii,* 676 F.2d at 923; *Dove,* 629 F.2d at 329. The intent of the law officers with respect to taking possession of contraband is particularly significant in this case.

■ The instruction submitted by the appellants does not deal with this distinction between observation and recovery. No finding is required that there has been recovery of the property; acquittal is allowed to follow simply from the actual and exclusive physical possession. Nor is the jury asked to consider whether DenOuden took possession of the car on behalf of its rightful owner. The instruction improperly assumes that actual exclusive physical possession is equivalent to recovery. The better reasoned cases show that this is an incomplete statement of the law. Thus,

the district court did not err in refusing to give the instruction.

## II.

The government filed two pretrial motions expressing its intent to introduce evidence of other crimes, wrongs, and acts against the defendants. *See* Fed.R.Evid. 404(b). One of the notices pertained to similar crimes evidence in the government's case-in-chief. These acts fell into four groups: (1) Agent Rindt's sales between May and December 1982 to Breedlove and Bailey of false Kansas titles and salvage titles with VIN tags; (2) Breedlove and Bailey's receipt of blank "Nader" stickers in December 1982; (3) Morgan's purchases from Christopher of salvage titles with VIN tags between February 1981 and March 1982; and (4) Breedlove, Bailey, and Johnson's delivery to Rindt and Schlup of salvage vehicles and titles between January and December 1982. Each defendant had previously listed his proposed trial defenses as lack of knowledge, lack of intent, and entrapment. The reports, documents, and other evidence proving these acts had been available for review by defense counsel. The government advised the court that only one witness, an FBI undercover agent, would be required to prove the prior criminal acts. After considering the arguments of all parties, the court ruled that the evidence was admissible on the issues of knowledge and intent.

The other notice pertained to similar crimes evidence that the government proposed to offer only during cross-examination and in rebuttal if the defendants testified. The court ruled the rebuttal acts admissible but advised the defendants that this ruling was not firm and that it might later sustain a proper objection before the evidence was offered. During its case-in-chief, the government introduced evidence described in the pretrial motion. Following the government's case-in-chief, the court instructed each defendant regarding the right to testify. No defendant chose to testify, allegedly because the court had denied their motions in limine relating to oth-

er crimes. No mention was made at trial of the rebuttal evidence.

 On appeal, the defendants urge that the trial court erred in denying their motions in limine and in admitting other crimes evidence during the government's case. We need not review the issue relating to evidence that the government intended to introduce during rebuttal and cross-examination, because it has not been properly preserved. In *Luce v. United States,* —— U.S. ——, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), the Supreme Court held that a defendant must testify to raise and preserve for review a claim of improper impeachment with a prior conviction. The reason is that any harm flowing solely from an in limine ruling is "wholly speculative." *Id.* 105 S.Ct. at 463. Although *Luce* was decided under Fed.R.Evid. 609(a)(1), its logic applies with equal force to motions under Rule 404.[9] *See also United States v. DiMatteo,* 759 F.2d 831, 832–33 (11th Cir. 1985) (applying *Luce* to Fed.R.Evid. 608(b)). Thus, we reject the defendants' claim that the trial court's in limine ruling on cross-examination and rebuttal evidence effectively prevented them from testifying.[10]

 The next issue is whether the court erred in admitting evidence of other crimes during the government's case-in-chief. Under Rule 404(b), evidence of other crimes, wrongs, or acts is inadmissible to prove a defendant's character to show that his actions conformed to that character. Such evidence is admissible, however, to show intent, preparation, plan, or knowledge. The decision is committed to the district judge's broad discretion when: the evidence is relevant to an issue other than the defendant's character; clear and convinc-

ing evidence exists that the defendant committed the wrongful acts; and the potential unfair prejudice of the evidence does not substantially outweigh its probative value. *United States v. Hutchings,* 751 F.2d 230, 238 (8th Cir.1984).

 The government's proof of other wrongs was relevant to meet the defenses of lack of knowledge and intent, apart from showing that the defendants acted in conformity with their character.[11] The defendants now argue, however, that the proof of other wrongs was not clear and convincing and that it was unduly prejudicial. The testimony of government agents adequately proved the similar acts. This proof was not prejudicial in that it played a minor role in comparison to the substantial evidence concerning only the crimes charged in the indictment. Our review of the record shows that the district court did not abuse the broad discretion that it is accorded in these matters. *See United States v. Carr,* 764 F.2d 496, 499 (8th Cir.1985); *United States v. DeLuna,* 763 F.2d 897, 911 (8th Cir.1985); *United States v. Evans,* 697 F.2d 240, 248 (8th Cir.), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 352 (1983). Any undue prejudice was mitigated by the comprehensive limiting instructions that the court gave. *See United States v. Bourgeois,* 746 F.2d 401, 405 (8th Cir.1984).

### III.

 All the defendants challenge the admission of tapes recording conversations with Schlup. Citing *United States v. McMillan,* 508 F.2d 101, 104–05 (8th Cir. 1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975), they argue that no proper foundation was laid because the government did not show that the tapes

9. Both rules require the court to determine whether the danger of undue prejudice outweighs the probative value of the evidence. Fed.R.Evid. 404(b) advisory committee note; Fed.R.Evid. 609(a)(1).

10. The Court noted in *Luce* that an accused's decision to testify "seldom turns on the resolution of one factor." 105 S.Ct. at 463 (quoting *New Jersey v. Portash,* 440 U.S. 450, 467, 99 S.Ct. 1292, 1301, 59 L.Ed.2d 501 (1979) (Blackmun,

J., dissenting)). Thus, a reviewing court cannot assume that an adverse evidentiary ruling motivated a decision not to testify. *Id.*

11. This is not to say that the government must await a defendant's denial of knowledge or intent before introducing this type of evidence. *United States v. Lewis,* 759 F.2d 1316, 1349 n. 14 (8th Cir.1985).

were authenticated at or near the time they were recorded. Although *McMillian* contains a comprehensive set of requirements for admitting such tapes, the court did not hold that tapes must be reviewed for accuracy contemporaneous with their completion. Schlup testified that the tapes played for the jury fairly and accurately represented the conversations that he had recorded. The decision to admit the tapes is subject to reversal only for a clear abuse of discretion. *Williams v. Butler*, 746 F.2d 431, 440 (8th Cir.1984). Our study of the record convinces us that the district court did not err in finding that proper foundations were laid for admitting the tapes. *See United States v. Franklin*, 747 F.2d 497, 498 (8th Cir.1984); *Williams*, 746 F.2d at 440–42; *United States v. Panas*, 738 F.2d 278, 286–87 (8th Cir.1984).

The defendants also complain of an "unexplained gap" of roughly thirty seconds in one tape. Inaudible portions will make a tape inadmissible only if they are so substantial as to render the recording as a whole untrustworthy. *Williams*, 746 F.2d at 442; *United States v. Greenfield*, 574 F.2d 305, 307 (5th Cir.), *cert. denied*, 439 U.S. 860, 99 S.Ct. 178, 58 L.Ed.2d 168 (1978). An FBI agent testified that the omission was probably caused by a defect in the microphone wiring, which was corrected. Under these circumstances, the short gap did not render the whole tap untrustworthy. *See United States v. Nicoll*, 664 F.2d 1308, 1314 (5th Cir.), *cert. denied*, 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1330 (1982).

## IV.

On January 29, 1982, Bailey and Breedlove met with Schlup, and Schlup recorded their conversation. Among other things, these two defendants advised Schlup on how to remove VIN tags without scratching them. A tape of this conversation was played for the jury. Johnson and Morgan argue that the court erred in admitting the tape against them because the statements on it were hearsay. Although the indictment charges that the conspiracy commenced on or about February 3, 1982, the government urges that the January 29th statements were made in furtherance of the conspiracy.

A statement is not hearsay if it is offered against a party and is a statement of a party during the course and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E). To have statements admitted under this provision, the government must demonstrate by a preponderance of independent evidence that a conspiracy existed, that the declarant and the defendants were members of the conspiracy, and that the declaration was made during the course of and in furtherance of the conspiracy. *United States. v. Lewis*, 759 F.2d 1316, 1342 (8th Cir.1985); *United States v. Schepp*, 746 F.2d 406, 411 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985). A conspirator's statements made before the conspiracy do not fall within this definition. *United States v. Leroux*, 738 F.2d 943, 949 (8th Cir.1984). The defendants mistakenly argue that the timing of the conspiracy must be limited by the indictment. The indictment is not dispositive, however, because the coconspirators exception can be invoked even when the defendants are not charged with conspiracy. *See Lewis*, 759 F.2d at 1347; *United States v. Smith*, 596 F.2d 319, 321 (8th Cir.1979). Similarly, we dismiss the government's argument that January 29 is "on or about" February 3 and thus within the conspiracy charged. The government does not cite, nor can we find, independent evidence in the record that a conspiracy existed on or before Jan. 29. Unlike the court in *Leroux*, 738 F.2d at 950, we see no adequate independent proof that an "illegal plan" involving Johnson and Morgan existed prior to February 3.

The admission of the tape was, however, harmless beyond a reasonable doubt. First, the tape was cumulative on its most crucial point—the advice concerning the tags. In laying the foundation for the tape, Schlup testified that he met with Breedlove and Bailey on January 29. He stated that Breedlove and Bailey had in-

structed him "on how to remove vehicle identification tags." Tr. 238. No proper objection was raised to the question or answer. To the extent that the tape is cumulative of this testimony, its admission was harmless. *See United States v. Lee,* 743 F.2d 1240, 1250 (8th Cir.1984). Second, the conversation does not mention Morgan or Johnson, the objecting defendants. *See United States v. Schepp,* 746 F.2d at 411; *United States v. Jannotti,* 729 F.2d 213, 219 (3d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984).

### V.

Defendants Bailey, Breedlove, and Morgan argue that they were denied due process by the government's failure to preserve all the vehicle identification numbers on the Cadillac found in Illinois. On February 4, 1983, a brown 1981 Cadillac DeVille was recovered from an individual in Lake of the Hills, Illinois. It was then stored in a police impoundment lot. The vehicle bore a VIN tag with the number 2699. An expert witness for the government examined the vehicle and found derivatives of this number stamped on the transmission, engine, and frame. He testified that these derivatives had been restamped, after the original numbers had been ground off. In addition, he discovered a "34" marked in grease pencil on the hood and testified that this corresponded to the factory VIN (4034) of the Cadillac stolen in St. Louis. An FBI agent testified that following inspection of the vehicle, Illinois State Police removed the "2699" tag and replaced it with the "4034" tag. Apparently, the car was released from police custody and eventually sold to an individual in Mount Prospect, Illinois. On June 7, 1984, Agent DenOuden examined the same vehicle in Chicago and found the "511" stamped on both frame rails. On June 19, 1984, an FBI agent inspected the vehicle in Wheeling, Illinois. He discovered the number "511" stamped on the frame rail under the driver's side.

During the week of June 25, 1984, the defendant's expert inspected the Cadillac in Chicago. He testified that he found the number "2699" stamped on the transmission. He also stated that the derivative numbers on the engine and frame had been ground off. The expert also discovered a "511" stamped on the left frame rail, which he concluded was stamped more recently than February 1982.

At the close of defendants' cases, they moved to dismiss the indictments on the ground that the government had failed to produce all the VIN's on the car. They argued that the government had a duty to take custody of the vehicle to preserve it for trial. The district court denied the motion and found: "[T]here's certainly no evidence that the agents or the official federal government acquiesced in or knowingly acquiesced in or took any affirmative action toward destroying any identification if in fact it has been destroyed." Tr. 933.

On appeal, the defendants argue that the government's culpability arises from releasing the vehicle, enabling the identification numbers to be destroyed. We believe that this issue is controlled by *California v. Trombetta,* —— U.S. ——, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). In *Trombetta,* the Supreme Court held that the state of California's failure to preserve breathalyzer samples did not violate the due process clause. The court looked at three factors: (1) whether the state was acting in good faith and in accord with normal practices; (2) whether the evidence allegedly destroyed possessed exculpatory value that was apparent before the evidence was destroyed; (3) whether the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means. *Id.* 104 S.Ct. at 2534.

In this case, these factors do not compel dismissal of the indictment. First, the district court's finding that no federal officials acted in bad faith is not clearly erroneous. *Cf. Cody v. Solem,* 755 F.2d 1323, 1331–32 (8th Cir.1985) (unexplained loss of evidence does not alone establish that the government has acted in bad faith). Second, it is not clear that the numbers allegedly destroyed had exculpatory

value at the time of destruction. *See United States v. Martinez,* 744 F.2d 76, 80 (10th Cir.1984). There was testimony that the engine and frame numbers allegedly ground off were restamps and that restamping was common among car thieves retagging stolen vehicles. Finally, the defendants had reasonable access to the vehicle after the numbers had allegedly been destroyed. On cross-examination, they established that many techniques are available for raising stamped numbers that have been altered. Their ability to employ these methods may have been hampered because they waited until the week of trial before sending their expert to examine the car. The delayed examination cannot, however, be blamed on government misconduct.

In *United States v. Larson,* 555 F.2d 673 (8th Cir.1977), the defendant raised a similar argument. Relying on *United States v. Bryant,* 439 F.2d 642 (D.C.Cir.1971), he urged that the government had a duty to preserve a stolen vehicle upon recovery. The court rejected his argument, finding that the failure to preserve had not resulted in prejudice because the "[d]efendant was able to inspect the vehicle before trial and presented expert testimony on the question of whether the vehicle had been rebuilt as defendant asserted." 555 F.2d at 675. After balancing the government's culpability and the materiality of the evidence, we conclude that the alleged destruction of evidence did not deprive the defendants of a fair trial. *See United States v. Doty,* 714 F.2d 761, 764–65 (8th Cir.1983).

■ We also reject Morgan's argument that the district court erred in not allowing the jury to view the vehicle. Because a jury view would have been time-consuming and cumulative of photographic evidence and the testimony, the district court did not abuse its discretion in denying the view request. *See United States v. Drougas,* 748 F.2d 8, 30–31 (1st Cir.1984).

## VI.

Special Agent Rindt testified on direct about a conversation that he had with John-son during the fall of 1982. The talk related to dismantling stolen vehicles and selling the parts. On cross-examination, Johnson's counsel asked: "There was nothing about those conversations that had anything to do with Mr. Breedlove or Mr. Bailey or Mr. Morgan or anything like that, was there?" Tr. 501–02. The agent replied: "Yes, there was. The name—The names that he mentioned were Breedlove and Bailey." *Id.* at 502. No objection was made to the question before it was answered. A short time later, though, defendants Breedlove and Bailey requested a mistrial. They argued that the statement was not admissible under the coconspirator exception and that the admission of inculpatory statements by a nontestifying defendant-declarant violated their confrontation rights. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The district court denied the motion for a mistrial but gave the following limiting instruction:

Conversations that occurred in the fall of 1982 are not to be considered by you in this case, and the last statement made by the witness concerning Mr. Johnson— mentioning Mr. Breedlove's name and Mr. Bailey's name insofar as chopping cars * * * will be stricken. That is not to be considered by you for any purpose whatsoever.

Tr. 504.

■ Breedlove and Bailey now urge that Johnson's testimony requires reversal of their convictions on sixth amendment grounds. We find persuasive reasoning to reject this argument in *United States v. Armedo-Sarmiento,* 545 F.2d 785, 795 (2d Cir.1976), *cert. denied,* 430 U.S. 917, 97 S.Ct. 1331, 51 L.Ed.2d 595 (1977). On cross-examination, a police officer testified concerning the out-of-court statements of an absent defendant. Counsel for the absent defendant asked who the "others" were that were active in a narcotics business. The answer incriminated a co-defendant and although no objection had been made to the question, his lawyer moved for

a mistrial. Codefendant's counsel had been advised that his client might be named in response to such a question. In rejecting a sixth amendment claim on appeal, the court found that applying *Bruton* would be "most inappropriate." *Id.* "When a defendant has been made fully aware of the response which a question is bound to elicit, he should object when the question is asked, rather than delay with the hope of inviting error and laying the foundation for a mistrial. Any other rule would put the prosecution at the mercy of the defense in a multi-defendant trial." *Id.* (citations omitted). While we cannot say that Breedlove and Bailey should have been fully aware of Rindt's answer, the possibility of a prejudicial response could have reasonably been anticipated. With the leading nature of the question, specifically mentioning Breedlove and Bailey, counsel had notice that the response could implicate their clients. Counsels' failure to object bars intensive review of the error alleged here. The limiting instruction eliminated the chance of plain error. *See United States v. Astling,* 733 F.2d 1446, 1454–56 (11th Cir.1984). Thus, we reject the sixth amendment challenge.

## VII.

During opening statement, the government's attorney referred to Morgan as a "St. Louis, Missouri auto thief." Tr. 13. Seven days later, Morgan's attorney moved for a mistrial on the grounds that there was no evidence that Morgan stole the car in question. Counsel's delay in raising an objection is deemed a waiver, precluding review of this issue except on plain error grounds. *See United States v. Ellsworth,* 738 F.2d 333, 337 (8th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 528, 83 L.Ed.2d 415 (1984). Based on the whole record, we cannot say that the remark resulted in a miscarriage of justice. *See United States v. Splain,* 545 F.2d 1131, 1136 (8th Cir.1976); *cf. United States v. Signer,* 482 F.2d 394, 400 (6th Cir.) (characterizing defendant in tax evasion case as a thief based on an *unrelated* transaction involving diversion of funds was plain er-

ror), *cert. denied,* 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973).

Improper prosecutorial statements during closing argument have been a persistent problem in this circuit. *Llach v. United States,* 739 F.2d 1322, 1330 (8th Cir.1984). The reversal of a defendant's conviction in *United States v. Lee,* 743 F.2d 1240, 1253 (8th Cir.1984), demonstrates that this court will not tolerate emotional appeals calculated to divert the jury from the facts before it. A United States attorney "may prosecute with earnestness and vigor—indeed he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is * * * his duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), *quoted in Llach,* 739 F.2d at 1331.

We are troubled by the prosecutor's conduct. That the comment here was made during an opening statement makes it more egregious than a similar remark would be during closing argument. In *Lee,* it was noted that certain improprieties during closing argument may be excused as the product of provocation by defense counsel. 743 F.2d at 1253. An opening statement, however, does not unfold in such a charged atmosphere. We presume that the opening statement in a case as complex as this was carefully planned. There was no evidence introduced that Morgan was a car thief, although a jury could have inferred that the theft of the Cadillac from the dealership five days after the sale to Morgan of the VIN plate supported such a conclusion. The statement poisoned the minds of the jurors at the commencement of the trial and was thus improper. In a closer case it would result in reversal. Because this issue can be reviewed only on plain error grounds, however, Morgan's conviction must be upheld. There is strong evidence of his guilt and substantial indication that he was heavily involved in retagging stolen vehicles. Nonetheless, we admonish the

district attorney that the opening statement serves the function of outlining the evidence to be introduced and that if it is used to impugn a defendant's character improperly as it was here, the risk of reversal is substantial. *See Signer,* 482 F.2d at 398.

## VIII.

Bailey and Breedlove argue that the indictment should have been dismissed because it was based on perjured testimony. Agent DenOuden told the grand jury in December 1983 that the FBI had discovered the "511" number on the frame of the car seized in Chicago. At trial, he conceded that this number was not discovered until June 7, 1984. Admitting that his statement before the grand jury was untruthful when it was made, DenOuden contended that his answer was based on his belief at that time. These defendants also claim that DenOuden misled the grand jury concerning the "true" VIN's discovered on the car in Illinois.

 These facts do not justify dismissal of the indictment. First, it has not been shown that DenOuden's statements rose to the level of perjury, which is an intentional, voluntary and knowing false statement. *See United States v. Flake,* 746 F.2d 535, 538–39 (9th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1220, 84 L.Ed.2d 360 (1985); *United States v. Lardieri,* 497 F.2d 317, 320 (3d Cir.1974). Misstatements or mistakes alone do not justify dismissing an indictment that is facially valid. *United States v. Levine,* 700 F.2d 1176, 1180 (8th Cir.1983). Second, an indictment should not be dismissed if there is "some competent evidence to sustain the charge issued." *Truchinski v. United States,* 393 F.2d 627, 633 (8th Cir.), *cert. denied,* 393 U.S. 831, 89 S.Ct. 104, 21 L.Ed.2d 103 (1968). Even assuming that DenOuden perjured himself, the defendants have not shown that the grand jury heard no evidence competent to sustain the indictment.

## IX.

 The defendants argue that the sale of the salvage VIN tag to Morgan was "outrageous" government conduct in violation of the fourteenth amendment. But for this conduct, they contend, no Cadillac would have been stolen in St. Louis. The question here is whether the government agent's conduct was so outrageous and shocking that it exceeded the bounds of fundamental fairness. *See United States v. Russell,* 411 U.S. 423, 431–32 (1973); *United States v. McCaghren,* 666 F.2d 1227, 1320–31 (8th Cir.1981). In *United States v. Leroux,* 738 F.2d 943 (8th Cir. 1984), the same argument was raised in the context of an FBI sting operation. The court found that the agents' conduct fell far short of being "demonstrably outrageous." *Id.* at 948. The government involvement in this case is no more culpable than that in *Leroux,* and we find that it did not violate the fourteenth amendment. *See also United States v. Udofot,* 711 F.2d 831, 841 (8th Cir.) (undercover agent's solicitation of unlawful firearms purchase did not violate due process), *cert. denied,* — U.S. —, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983); *United States v. McCaghren,* 666 F.2d 1227, 1231 (8th Cir.1981) ("substantial" involvement by DEA agents not fundamentally unfair); *cf. United States v. Lard,* 734 F.2d 1290, 1297 (8th Cir.1984) (found outrageous "conduct designed to instigate 'a criminal act by persons otherwise innocent in order to lure them to its commission and to punish them'") (quoting *United States v. Russell,* 411 U.S. 423, 428–29, 93 S.Ct. 1637, 1641–42, 36 L.Ed.2d 366 (1973)).

## X.

 Bailey, Breedlove, and Johnson complain of the district court's refusal to excise certain statements from their presentence reports. Included in Johnson's presentence report was a 1946 conviction for altering a government note. He received probation, which was revoked, and served two years in prison. There is no record that Johnson was represented by

counsel during the conviction or probation revocation. The district court stated that it would not consider the conviction in sentencing, but refused to strike it from the report.[12] In *Tucker v. United States*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), the Supreme Court held that uncounseled convictions in violation of *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), may not be used to enhance punishment for another offense. To prevail on a challenge under *Tucker*, the defendant must show: a prior conviction invalid under *Gideon;* the sentencing judge's mistaken belief that the prior conviction was valid; and enhancement of the defendant's sentence based on the prior conviction. *Farrow v. United States*, 580 F.2d 1339, 1345 (9th Cir.1978) (en banc). Johnson has failed to show the last two elements. The district court stated that it did not consider the conviction in sentencing.

■ Johnson seems to suggest that the conviction should be stricken from the presentence report even though the conviction is not considered by the district court. The court has no obligation, however, to strike any material from the report. *See United States v. LeBlanc*, 762 F.2d 502, 505 (6th Cir.1985); *Williams v. United States*, 711 F.2d 847, 848 (8th Cir.1983); *United States v. Legrano*, 659 F.2d 17, 18 (4th Cir.1981); Fed.R.Crim.P. 32(c)(3)(D). It need go no further than stating that a controverted matter will not be considered in sentencing.[13]

■ All the defendants challenge material in their presentence reports concerning their extensive activity with stolen cars. The district court has wide discretion in sentencing and its inquiry is "largely

unlimited either as to the kind of information he may consider, or the source from which it may come." *Tucker*, 404 U.S. at 446, 92 S.Ct. at 591. The court may consider criminal activity for which the defendants have not been prosecuted and uncorroborated hearsay, provided that the defendants are given a chance to rebut or explain it. *United States v. Ray*, 683 F.2d 1116, 1120 (7th Cir.), *cert. denied*, 459 U.S. 1091, 103 S.Ct. 578, 74 L.Ed.2d 938 (1982). The defendants were given an opportunity to challenge the presentence reports. Tr. 1049–88; *see* Fed.R.Crim.P. 32(a)(1). We conclude that the court did not abuse its discretion in considering the reports or pronouncing sentence. *See United States v. Papajohn*, 701 F.2d 760, 763–64 (8th Cir. 1983).

The convictions of each appellant are affirmed.

---

**12.** THE COURT: The problem with that is he actually served some time in regard to that conviction, that sentence, which you can't erase that.

It's the normal rule if the defendant was not represented by counsel, certainly I don't give it any consideration. But as a rule, I would order it stricken, but in view of the fact that he was placed on probation and then it was revoked and then he thereafter served time, I'm going to deny your motion to strike.

**13.** Although not considered by the sentencing court, certain items in a presentence report may nonetheless be received by the United States Parole Commission. An inmate who desires to contest these items may pursue an administrative remedy. *See* 28 C.F.R. § 2.19(c) (1984). We need not decide whether *Tucker* imposes any special obligation on the Bureau of Prisons or the Parole Commission.