UNITED STATES of America, Appellee,

v.

John MUZII, Defendant-Appellant.

No. 848, Docket 81-1443.

United States Court of Appeals,
Second Circuit.

Argued April 12, 1982.

Decided April 19, 1982.

**920**

Irving Anolik, New York City, for defendant-appellant.

John B. Latella, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y., Vivian Shevitz, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for appellee.

Before KAUFMAN and VAN GRAAF-EILAND, Circuit Judges.*

IRVING R. KAUFMAN, Circuit Judge:

The reach of the criminal law has long been limited by the principle that no one is punishable for his thoughts.[1] Accordingly, not only has a criminal state of mind, or mens rea, been a general condition of penal liability,[2] but the imposition of the criminal sanction has required a guilty act, or *actus reus*, by the person sought to be held liable. This act must be contemporaneous with the guilty mind. The *actus reus* requirement has been justified on the grounds that it is

difficult to distinguish between mere daydreams and resolute intention in the absence of some physical act or behavior, and that an attempt to punish evil thoughts alone would cast the net of the criminal law too widely.[3] The *actus reus* must have its origin in some willed activity or omission on the part of the defendant. Moreover, the guilty act cannot exist in the absence of the surrounding circumstances and consequences associated with the offense forbidden by law.[4] In this case, we are asked to determine whether the circumstances concerning the Government's method of detecting the crimes charged in the indictment operated to preclude the commission of a guilty act. Specifically, we must decide if the activities of detectives engaged in an undercover operation resulted in the recovery of stolen pharmaceuticals by the owner or his agent prior to delivery of the stolen drugs to appellant, thereby causing the goods to lose their stolen character and rendering appellant incapable of committing the guilty act of receiving stolen property. We turn now to the facts of this case.

John Muzii appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York after a jury trial before Judge Charles P. Sifton. Muzii was convicted of two counts of receiving and possessing goods moving in interstate commerce with a value of more than $100.00, knowing the goods to have been stolen, in violation of 18 U.S.C. § 659, and one count of conspiracy to receive and possess such goods, in violation of 18 U.S.C. § 371. Judge Sifton sentenced Muzii to concurrent terms of imprisonment

---

\* With the consent of the parties, pursuant to Rule 0.14 of the Rules of the Second Circuit, this appeal was heard by a panel of two judges. Judge William H. Timbers was scheduled to participate, but was indisposed.

1. S. Kadish & M. Paulsen, Criminal Law and its Processes 207 (1969).

2. Despite the long-standing commitment of traditional Anglo-American criminal jurisprudence to the requirement of *mens rea*, there have been departures from it in a number of situations. The felony-murder and misdemeanor-manslaughter doctrines, and statutes defin-

ing as criminal offenses bigamy and sexual acts with minors provide examples of crimes for which a *mens rea* requirement has been eliminated. *See* S. Kadis & M. Paulsen, *supra*, note 1 at 247. The acceptance of strict criminal liability for violations of regulatory statutes represents another departure from the *mens rea* principle. *See* Campbell, *A Strict Accountability Approach to Criminal Responsibility*, 29 Fed.Prob. 333 (1965).

3. G. Williams, Criminal Law 2 (2d ed. 1961).

4. Id. at 16.

of two years on each of the three counts, fines of $5,000 on each of the substantive counts and a fine of $10,000 on the conspiracy conviction, for a total fine of $20,000. On appeal, Muzii raises several claims, the only serious one of which is that at the time the stolen pharmaceuticals came into his possession, they had lost their character as stolen property as a result of the participation of undercover agents working on the case. For the reasons stated below, we reject Muzii's contentions, and affirm the judgment of conviction.

This case is the result of a carefully orchestrated undercover operation. In 1976, the New York City Police Department initiated an investigation designed to apprehend those responsible for the theft of cargo from airline carriers at John F. Kennedy International Airport in New York. To establish a base for infiltrating the ranks of truck drivers and warehousemen involved in the thefts, the Department operated a trucking company, known as Inner City Trucking, Inc., and staffed by both the detectives from the New York City Police Department and by agents of the United States Customs Service. Working undercover, the detectives and agents were able to obtain information concerning cargo thefts at the Airport. The law enforcement officers utilized the facade of a legitimate business to facilitate their operation.

Two New York City detectives, Richard Marrone and Samuel Velez, held themselves out as the owners of the trucking company. Through their undercover work, they met Ralph Simonetti, a truck driver for the Imperial Air Freight Company. Between 1977 and 1979, Simonetti spoke to Velez on the topic of cargo thefts on numerous occasions, and brought several shipments of stolen goods to Velez and Marrone at the trucking company. In the spring of 1979, Simonetti asked Velez and Marrone if he could use the trucking company's warehouse as a "drop" for a shipment of stolen ulcer pills before delivering them to the ultimate purchaser. Velez expressed his assent. On June 14, 1979, Simonetti introduced Domenick Vullo, a truck driver for Profit By Air, Inc., to detectives Marrone and Velez, and arrangements were made for the delivery of the stolen pharmaceuticals. Vullo delivered the drugs on June 20.[5] On the next morning, Ralph Simonetti arrived at Inner City Trucking, Inc., to inspect the stolen drugs. Simonetti placed a call to John Muzii, a druggist in the Bronx, from the business office of the trucking company for the purpose of making arrangements for delivery of the drugs. Later that morning, Simonetti and Gerald Weiss loaded the boxes of stolen drugs into Simonetti's car, and stated that they would deliver the goods to the druggist. Later, Simonetti called Detective Marrone at the trucking company to inform him that the transaction had been completed, and, on June 25, met with Marrone to pay him $1000 as his share of the proceeds earned from the sale to Muzii.

On July 18, 1979, Domenick Vullo brought another shipment of stolen pharmaceuticals to Inner City Trucking.[6] On the next morning, Simonetti and Weiss picked up the drugs from the trucking company, and drove to a Howard Johnson's restaurant in the Bronx, where they met John Muzii. Muzii left the restaurant a few minutes later, after engaging in a brief conversation with the pair. Alfred Lewis, an employee of the Muzii Drug Company, soon arrived at the restaurant in a car owned by John Muzii. After speaking briefly with Simonetti and Weiss, Lewis drove away in Simonetti's car, which contained the stolen drugs. Lewis then proceeded to an apartment building one block from the premise of the Muzii Drug Company, and unloaded the drugs from the car.

---

5. At trial, the parties stipulated that these drugs had been stolen from Profit By Air, Inc., a cargo carrier at JFK International Airport which employed Vullo, that the drugs had been part of a shipment in interstate commerce, and that the value of the stolen pharmaceuticals exceeded $50,000.

6. The parties stipulated at trial that these pharmaceuticals had been stolen from Profit By Air, Inc., that the drugs had been part of a shipment in interstate commerce, and that the value of the drugs exceeded $60,000.

Lewis returned to the Howard Johnson's Restaurant, spoke briefly with Simonetti and Weiss, and drove away in Muzii's car. On July 20, John Muzii and Ralph Simonetti met in a parking lot in Bayside, New York. A few days later, Simonetti delivered $1000 to Marrone and Velez as their share of the proceeds from the sale of the drugs to Muzii.

In October, 1979, Marrone and Velez revealed their true identities to Simonetti, and offered him an opportunity to cooperate. Simonetti agreed. Wearing a tape recording device, Simonetti met with Muzii at the Howard Johnson's Restaurant where the previous transaction had taken place. Their recorded conversation revealed certain details of the July 18th shipment and mentioned the possibility of another sale of stolen drugs.

A five count indictment was subsequently filed. John Muzii was charged in three counts. Domenick Vullo, Gerald Weiss, and Ralph Simonetti was named as co-defendants. Muzii was indicted on two counts of receiving and possessing stolen pharmaceuticals worth more than $100 and moving in interstate commerce, knowing them to have been stolen, on June 21 and July 18, 1979, in violation of 18 U.S.C. § 659. Muzii was also charged with one count of conspiring with his co-defendants to commit such an offense, in violation of 18 U.S.C. § 371. While Vullo, Weiss, and Simonetti each pleaded guilty,[7] Muzii stood trial before Judge Charles P. Sifton in the Eastern District of New York. Trial commenced in August, 1981. The Government presented the testimony of Detectives Marrone and Velez, as well as Special Agents Victoria Ovis and Donald Grattan of the United States Customs Service, who had observed the transactions at the Howard Johnson's Restaurant and in the parking lot in Bayside, New York. The Government also introduced videotapes[8] of meetings involving Marrone, Velez, Simonetti, and Weiss, and tape recordings of two conversations between Simonetti and Muzii. While Muzii did not testify in his own behalf, he presented the testimony of several character witnesses, who asserted that Muzii had an excellent reputation in his business community for honesty and truthfulness. Muzii also called to the stand a New York City police detective, who testified that he overheard a conversation between Muzii and Simonetti at a party in February, 1979, in support of Muzii's contention that he believed he was purchasing damaged or unclaimed drugs rather than stolen pharmaceuticals. The jury convicted Muzii on all three counts.

On appeal, Muzii's principal claim is that his conviction for knowingly receiving and possessing stolen pharmaceuticals in violation of 18 U.S.C. § 659 is invalid because the drugs had lost their status as stolen property before they were delivered to him.[9] Muzii argues that, because the stolen

---

**7.** Vullo pleaded guilty to the conspiracy count of the indictment and was sentenced to eighteen months in prison. Weiss also pleaded guilty to the conspiracy count, and was sentenced, pursuant to 18 U.S.C. § 3651, to serve six months of a two year prison term, with the balance of the sentence suspended, and two years' probation to follow. Simonetti pleaded guilty to one count of receiving and possessing stolen property in violation of 18 U.S.C. § 659, and was sentenced to a six year term of imprisonment.

**8.** Recently, in *United States v. Alexandro*, 675 F.2d 34 (2d Cir. 1982), this Court considered and rejected a challenge to the conviction of an investigator with the Immigration and Naturalization Service for bribe receiving, conspiracy to receive bribes, and unlawful conflict of interest arising from an FBI Abscam investigation.

In *Alexandro*, this Court held that the participation of Government agents, who made videotapes of meetings with the defendant, was not so excessively intertwined with the illegal scheme that due process prohibited the criminal prosecution of defendant. Since Muzii has not asserted that the activities of Marrone and Velez were so extensive and repugnant that his criminal prosecution violated due process and has not in fact challenged the admissibility of the videotapes, we need not apply these principles in this case.

**9.** We note that even if the goods lost their stolen character prior to delivery to Muzii, which we decline to hold, Muzii could be convicted of conspiracy to receive and possess stolen property in violation of 18 U.S.C. § 371, since the evidence was ample to support the existence of a conspiracy. *See United States v.*

shipments had come into the physical possession of the undercover detectives overnight on June 20 and July 18, before Muzii received possession of them, the drugs had been "recovered" for their rightful owner and were no longer stolen. *See United States v. Monasterski*, 567 F.2d 677 (6th Cir. 1977). Accordingly, Muzii asserts, although he may have formed the requisite *mens rea*, or intent to receive stolen goods, he could not have performed the *actus reus* of receiving and possessing stolen goods due to the involvement of the undercover agents.

■■■ Our analysis of the relevant case law leads us to the conclusion that the brief custody of the goods by the detectives at the trucking company did not amount to "recovery" of the drugs for their rightful owner and eliminate the stolen character of goods. Rather, the use of the company's facilities as a "drop" for stolen pharmaceuticals merely facilitated surveillance of the unlawful transaction and enabled the detectives to apprehend the ultimate purchaser. The detectives did not convert their limited role of observation into "recovery" of the stolen goods, since at no time did they exercise control over the drugs on behalf of the rightful owner, act as the owner's agent to recover the goods, or direct their delivery to Muzii. The brief physical custody of the pharmaceuticals was no more than a small segment of the overall undercover scheme designed to ferret out criminal activities planned and executed by others.

Judicial precedent firmly supports the line we draw today between surveillance and recovery of stolen goods by undercover agents seeking to apprehend those involved in the sale and purchase of such property. The proposition that one cannot be convicted of receiving stolen goods if, before the stolen goods reached the receiver, the goods had been recovered by their owner or his agent, including the police, is traceable to two nineteenth century English cases. *See*

*Regina v. Schmidt*, L.R. 1 Cr.Cas.Res. 15 (1866); *Regina v. Dolan*, 29 Eng.Law & Eq. 533 (1855). Later courts properly stressed that the essential condition for invoking this rule is actual or constructive possession of the stolen goods by the owner or his agent; mere surveillance or observation of the goods does not constitute actual or constructive possession. *See United States v. Monasterski, supra*, 567 F.2d at 680, 684. In *Monasterski*, Conrail police apprehended three youths who had stolen tires from a Conrail boxcar in a railroad yard. In an effort to capture the intended "fence," the Conrail police assisted in the transfer of the stolen tires to the defendant, and in fact supplied a van for their transport. The Sixth Circuit concluded that the stolen tires were recovered by their rightful owner and were delivered at the direction of the owner and law enforcement officials. Accordingly, the apprehended youths were no longer acting as participants in a criminal enterprise, but were agents for the police and Conrail, the rightful owner of the tires. Since the youths were acting under the authority of the owner who had recovered the goods, the Court held that the goods had lost their stolen character and the defendant, therefore, could not be convicted of knowingly receiving and possessing stolen goods, in violation of 18 U.S.C. § 659. *Id.* at 684. *See also United States v. Cawley*, 255 F.2d 338 (3d Cir. 1958) (mail had lost stolen character because, prior to delivery to defendant, postal inspectors with duty to recover mail solicited thieves to continue with their original design after their apprehension); *United States v. Cohen*, 274 F. 596 (3d Cir. 1921) (goods recovered by rightful owner prior to delivery to defendant).

When law enforcement officers have merely engaged in the surveillance of stolen goods before their delivery to a "fence," courts have uniformly concluded that the property did not lose its stolen character,

*Egger*, 470 F.2d 1179, 1181 (9th Cir. 1972), *cert. denied*, 411 U.S. 949, 93 S.Ct. 1931, 36 L.Ed.2d

410 (1973).

and the receiver of such property has committed the *actus reus* of receiving and possessing stolen goods. The Fourth Circuit, in *United States v. Dove*, 629 F.2d 325 (4th Cir. 1980), recognized the distinction between the actual recovery of stolen goods by or on behalf of the owner and the mere observation of stolen goods for the purpose of apprehending the individual who ultimately receives them. In *Dove*, the Court concluded that where the possession of stolen bulldozers by the undercover agent was not for recovery by the owner but was an integral part of the overall criminal design, the agent's conduct in the theft and subsequent sale was considered an act of observing the criminal activities. *Id.* at 329. *See also United States v. Egger*, 470 F.2d 1179 (9th Cir. 1972) (counting the stolen money and recording of serial numbers in presence of Government agents did not eliminate stolen character of money since actions of Government agents were a form of surveillance and observation rather than possession on behalf of the rightful owner), *cert. denied*, 411 U.S. 949, 93 S.Ct. 1931, 36 L.Ed.2d 410 (1973); *Copertino v. United States*, 256 F. 519 (3d Cir. 1919) (surveillance of stolen copper bars from a distance did not constitute actual or constructive possession of the bars by the owner or his agent); *Barnes v. United States*, 313 A.2d 106 (D.C.App.1973).

■ With these principles in mind, we conclude that the conduct of the detectives working undercover at Inner City Trucking constituted nothing more than observation or surveillance of the stolen pharmaceuticals, and accordingly did not eliminate the stolen character of the goods. Detectives Marrone and Velez were not instrumental in causing, nor did they attempt to cause, the delivery of the two shipments of drugs to Muzii. Furthermore, they were not operating under the authority or direction of the rightful owner in an attempt to entrap the receiver of the stolen goods. The undercover agents simply provided a convenient "drop" for Simonetti and his confederates to use before delivering the drugs to Muzii. They did not solicit Simonetti's cooperation in transferring the drugs to appellant, and Simonetti was not working under their direction when Muzii received the drugs. The detectives did no more than provide a place to store the stolen drugs for a single night where they could be observed while Simonetti independently made arrangements for delivery to Muzii. Accordingly, we reject Muzii's contention that the activities of the detectives precluded his commission of the *actus reus* of receiving and possessing stolen goods in violation of 18 U.S.C. § 659. Any other result would unreasonably impair the ability of law enforcement officials to apprehend "fences" for stolen property.

Since Muzii's other claims are completely without merit,[10] we affirm the judgment of conviction in all respects.

---

10. On appeal, Muzii has raised three additional claims: that the tape recordings of conversations between Simonetti and Muzii should have been ruled inadmissible because the recordings were made without court order and violated Muzii's expectation of privacy; that his conviction should be reversed and the indictment dismissed on the ground that his due process rights were violated by pre-indictment delay; and that the jury's verdict was not supported by the evidence. Since these claims are completely lacking in merit, we shall not discuss the reasons for rejecting them.