OPINION OF THE COURT
Wesley, J.
More than half a century ago, Nazis confiscated Jewish-owned artwork throughout Europe. Much of this artwork vanished during the war, but ultimately found its way into museums around the world; other pieces became part of private collections.
In this case we must determine whether Arts and Cultural Affairs Law § 12.03, which protects the artwork of nonresident lenders from “any kind of seizure” while on exhibit in New York State, encompasses a subpoena duces tecum requiring production of two paintings by Egon Schiele on loan to the Museum of Modern Art in New York from the Leopold Foundation in Vienna. The subpoena was issued by the New York County District Attorney’s office pursuant to a Grand Jury investigation into the theft of those paintings during the German annexation of Austria. The statute’s language and history lead us to conclude that the protection of section 12.03— which in the past has been used in the context of civil actions— applies under the circumstances of this case.
I.
In October 1997, the Leopold Foundation in Vienna loaned more than 150 works by Egon Schiele, the renowned Austrian expressionist, to the Museum of Modern Art for a three-month exhibit. “Portrait of Wally” and “Dead City III” were among the paintings exhibited. For three years prior to the exhibit in New York City, the collection was on a worldwide tour, having been displayed in England, Germany, Switzerland and Japan. After the Museum’s exhibit ended, the collection was scheduled for exhibition in Spain.
*733 On December 31, 1997, five days before the exhibition was to close, the Museum received two letters from persons claiming that “Portrait of Wally” and “Dead City III” were stolen from their rightful owners during the Nazi annexation of Austria. In one letter, Henri S. Bondi, writing on behalf of the heirs of his aunt, Lea Bondi, indicated that “Portrait of Wally” was taken from his aunt’s collection by Nazi agents or collaborators; that neither Lea Bondi nor her family consented to the sale or transfer of the painting; and that his aunt died at the age of 93 in London in 1969, having three years earlier attempted to regain the painting. Bondi inquired as to the requirements for proof of inheritance and ownership, and requested that the painting not be returned to the lender until the matter of ownership was clarified. According to Bondi, the heirs were willing to discuss all available options, but noted that their willingness to participate in such discussions was premised on specific written assurances that the painting would not be moved or transferred during the course of the discussions.
In the second letter, Kathleen E. Reif and Rita Reif, as heirs of Fritz Grunbaum, stated that “Dead City III” was taken from Grunbaum’s collection by Nazi agents or collaborators after his arrest following the Nazi annexation of Austria. Mr. Grunbaum subsequently died in the Dachau concentration camp. The Reifs indicated that they never consented to the sale or transfer of the painting, and that they, as Mr. Grunbaum’s heirs, were the lawful owners of the painting. The Reifs also demanded that the Museum turn “Dead City III” over to the them; take no steps to move the painting to another jurisdiction or transfer title or possession to anyone other than themselves; and inform Dr. Rudolf Leopold or the Leopold Foundation of their claim. The Reifs stated a willingness to discuss other options, but added that the Museum had to provide specific written assurances that “Dead City III” would not be moved or transferred during the pendency of those discussions. The Reifs also indicated that they reserved the right “to pursue alternative remedies, including legal remedies” with regard to this matter.
In response, the Museum sent two letters to each party. In the first letter, dated December 31, 1997, the Museum indicated that, while it was sympathetic to the ownership claims and was eager to see these claims resolved, it had a contractual obligation to return the entire Leopold collection to the lender after the exhibition closed. The letter further stated:
“Art museums * * * depend on art loans from *734 foreign institutions to organize exhibitions that make it possible for the public to see and appreciate art from all over the world. It is important for US museums to offer foreign institutions the security of knowing that loan agreements will be honored and, indeed, NY has a statute which specifically provides that works of art brought to New York for exhibition may not be seized or made subject to attachment.”
In a follow-up letter dispatched on January 4, 1998, the Museum reiterated its position with regard to its contractual obligations. The letter concluded:
“The exhibition is scheduled to be returned to the Leopold Foundation shortly after closing on Sunday, January 4. I am advising you, therefore, that the Museum intends to ship the painting to the lender on January 8 or shortly thereafter. The intervening period should afford you ample time to take such action as you deem appropriate to protect your interests.”
On January 7, 1998 the New York County District Attorney’s office served the Museum with a Grand Jury subpoena duces tecum and demanded the production of “Portrait of Wally” and “Dead City III.”
The Grand Jury had been convened to investigate whether the paintings were stolen by Nazi agents or collaborators and, if so, whether the stolen property was then possessed in New York County in violation of Penal Law § 165.54 (criminal possession of stolen property in the first degree). On January 22, 1998, the Museum moved to quash the subpoena on the ground that it was invalid pursuant to section 12.03 of the New York Arts and Cultural Affairs Law. The People and the Museum thereafter entered into an agreement whereby the Museum would maintain custody of the paintings until the conclusion of the litigation over the subpoena.
Supreme Court granted the Museum’s motion to quash the subpoena, holding that section 12.03 exempted the paintings from Grand Jury process. The Appellate Division reversed (253 AD2d 211), holding that the statute applied only to civil disputes and therefore did not limit a Grand Jury’s subpoena powers.
This Court granted the Museum’s motion for leave to appeal and for a calendar preference pursuant to Rules of the Court of *735 Appeals (22 NYCRR) § 500.8 (b). We now reverse the Appellate Division order and grant the Museum’s motion to quash the subpoena.
II.
The issue before us has two distinct facets. We must determine whether section 12.03 of New York’s Arts and Cultural Affairs Law is limited to civil proceedings. If not, we must then determine whether the subpoena issued in this case effectuates a seizure of the paintings and is thus prohibited by the statute.
Section 12.03 provides:
“§ 12.03. Exemption from seizure
“No process of attachment, execution, sequestration, replevin, distress or any kind of seizure shall be served or levied upon any work of fine art while the same is enroute to or from, or while on exhibition or deposited by a nonresident exhibitor at any exhibition held under the auspices or supervision of any museum, college, university or other nonprofit art gallery, institution or organization within any city or county of this state for any cultural, educational, charitable or other purpose not conducted for profit to the exhibitor, nor shall such work of fine art be subject to attachment, seizure, levy or sale, for any cause whatever in the hands of the authorities of such exhibition or otherwise” (emphasis added).
While section 12.03 delineates certain types of civil process, the unconditional language preceding and following this clause — “[n]o process” and “or any kind of seizure” — in no way suggests that the Legislature meant the delineated terms to be either exclusive or exhaustive. Indeed, there is no limiting language in section 12.03; the words are unqualified. Hence, on a facial reading of the statute, we are confident that the words — unrestricted as they are — are not limited to civil processes.
The legislative history of section 12.03 amply supports our interpretation.[1] While the impetus for this statute was a civil lawsuit involving the civil seizure of artwork on display at a *736 Buffalo museum, a comprehensive reading of the history reveals a consistent, unyielding legislative intent to promote artistic and cultural exchanges by creating a climate in New York free from the threat of seizure by judicial process and by encouraging nonresidents to share their works of art with the public. The essence of this legislation is perhaps best captured in Governor Rockefeller’s Memorandum of Approval, which states that many exhibitions in New York State:
“rely in most instances on loans of works of art for their success. The promotion and continuation of these events is necessary to maintain New York’s status as the art center of the Nation and is beneficial to the general cultural atmosphere of the State.
“Works of art lent by non-resident exhibitors are currently subject to seizure by legal process in the State. * * *
“The bill, by exempting such works of art from legal process where their presence in the State of New York is solely by the generosity of the exhibitor and not for any commercial purpose, will go far to allay the fears of potential exhibitors and enable the State of New York to maintain its pre-eminent position in the arts” (Governor’s Mem approving L 1968, ch 1065, 1968 NY Legis Ann, at 495).
The statute’s intent is twofold: to insulate nonresident lenders from seizures via legal process and, concomitantly, to protect State cultural institutions that depend upon the free flow of art for the benefit of the people of the State of New York. These purposes are also reflected in the Attorney General’s Memorandum of Support that the increased fear of harassment of nonresident artists and collectors regarding seizures could reap “incalculable harm” for New York’s cultural institutions if the bill did not become law (Attorney General’s Mem, Bill Jacket, L 1968, ch 1065).
*737 The Attorney General’s Supplemental Memorandum to the Governor, precipitated by a letter by the Committee on State Legislation of the Association of the Bar of the City of New York, farther underscores the statute’s goals. The Bar Association Committee expressed concern that the bill would prevent a rightful owner from recovering stolen art, which is what the owners of “Portrait of Wally” and “Dead City III” are attempting to do here. The Committee proposed that a distinction be made between the use of provisional remedies to seize artwork on loan to acquire quasi in rem jurisdiction and post-judgment remedies (see, Association of Bar of City of New York Letter dated June 17, 1968, Bill Jacket, L 1968, ch 1065).
In response, the Attorney General questioned the wisdom of creating any loopholes in the statute, reasoning that such exemptions would force potential good-faith lenders to seek legal advice before lending artwork to museums, thus defeating the bill’s purpose:
“To puncture the exemption sought by this bill with a single major loophole * * * thus forcing ‘potential-lenders-in-good-faith’ to seek legal advice before lending their works to museums of this State would be self-defeating, since non-resident artists and patrons of the arts can exercise their free alternative to stay out of trouble by keeping their possessions safely at home. The proverb that ‘half a loaf is better than nothing’ is exceedingly inapposite in this instance. * * *
“The primary policy concern of this bill is * * * with the museums and other cultural institutions of this State which are completely and thoroughly dependent upon the free flow of works of art into the State for the purpose of conducting exhibitions of major public interest. The exemption conferred by this bill upon the lenders of works of art is a small favor for the other risks involved in crating, shipping and exposing these works, often of fragile construction, to large New York audiences. Considering the alternatives open to potential lenders — to keep their works at home — it would seem that the State of New York is in no morally tenable position to bargain and equivocate over the scope of this bill if the cultural welfare of the People and their cultural institutions is of any real significance to *738 its lawmakers and. if this bill serves that welfare” (Attorney General’s Supplemental Mem, Bill Jacket, L 1968, ch 1065 [emphasis in original]).
It is well settled that legislative intent may be inferred from the omission of proposed substantive changes in the final legislative enactment (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 587). Thus, this history, coupled with the language of the statute, demonstrate a clear mandate from the Legislature. The statute’s “no loopholes” approach compels our holding that Arts and Cultural Affairs Law § 12.03 is not limited to civil process.
III.
This determination does not end our inquiry. According to the language of the statute, before the legal process in question runs afoul of the statute, it must constitute or effectuate a “seizure.” We interpret “seizure” according to its commonly understood meaning (Tompkins v Hunter, 149 NY 117, 122-123). As we have stated:
“In construing statutes, it is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or contradiction, there is no room for construction and courts have no right to add to or take away from that meaning” (id., at 122-123).
“Seizure,” as used in everyday parlance, is understood to mean “the action or an act of seizing, or the fact of being seized; confiscation or forcible taking possession” (Oxford English Dictionary [2d ed 1989]). “Seize” in turn is defined as “to put in possession” or “to take possession of (goods) in pursuance of a judicial order” (id.). While this Court has not had occasion to comment upon the meaning of “seizure” in a property context, the commonly understood meaning comports with the United States Supreme Court’s definition of “seizure” as “some meaningful interference with an individual’s possessory interests in * * * property” (United States v Jacobsen, 466 US 109, 113).
Given the facts of this case, we reject the Museum’s argument that there are no conceivable circumstances in which a judicial process may abide the statute. In order to afford *739 artwork the protective cloak of section 12.03, the process at issue — whether civil or criminal — must constitute or effectuate meaningful interference with a lender’s possessory interest in that property. The statutory language is unequivocal.
What then is the effect of the subpoena in this case? Clearly, a subpoena duces tecum is a process of a court (CPL 610.10 [2], [3]). While a subpoena of this kind generally does not authorize the seizure, impoundment or other disruption in possession of property, and is not intended to deprive its custodian of control (Matter of Heisler v Hynes, 42 NY2d 250, 252), nonetheless in the context of this case the subpoena rises to the level of “meaningful interference with [the lender’s] possessory interest” for purposes of section 12.03. In the absence of a court ruling limiting the issuer’s right to retain the evidence, “the prosecutor may lawfully exercise dominion and control over the evidence” (Matter of Brunswick Hosp. Ctr. v Hynes, 52 NY2d 333, 338; CPL 610.25). No ruling limiting the People’s right to retain the paintings has been issued here. The paintings, which were scheduled to leave New York well over a year and a half ago, are still present in this State and an indictment has not been forthcoming. As a practical consequence of the subpoena, the Museum has been and would continue to be precluded indefinitely from returning the paintings to the Leopold Foundation. We conclude that the subpoena here has interfered significantly with the Leopold Foundation’s possessory interests in the paintings by compelling their indefinite detention in New York, and thus effectuating a seizure.
IV.
The Appellate Division relied on CPL 610.25 (2) in concluding that no seizure has occurred. The statute was enacted in specific response to our invocation for legislative action in light of the absence of a statutory scheme authorizing prosecutors to use a subpoena duces tecum to compel a witness to surrender possession of the property subpoenaed (see, Matter of Heisler v Hynes, supra, at 254). The section provides that the prosecution must give notice to the owner of any subpoenaed property if the property is to be retained (CPL 610.25 [2]). The People, however, have disavowed this interpretation of the statute and *740 steadfastly assert the statute applies only to post-indictment/ pre-trial subpoenas.[2]
We need not pass on the scope of this section disputed by the People and embraced by the Appellate Division. The People have taken the position that they are entitled to indefinite, unencumbered control of these paintings as long as the Grand Jury continues to investigate this matter. The People, in essence, seek to impound the paintings until their rightful owners are determined (see, Matter of Heisler v Hynes, 42 NY2d 250, 253 [discussing the “drastic” nature of impoundment]).
Moreover, as Supreme Court correctly noted, Penal Law § 450.10, which provides a mechanism for returning allegedly stolen property to an owner prior to, or during the pendency of, a criminal proceeding, requires proof of title before property in the custody of the People or the court can be returned. Thus, a civil-like proceeding would have to be commenced in this case to return the paintings to the rightful owners under either CPL 610.25 (2) or Penal Law § 450.10 — regardless of the outcome of the People’s case.
Contrary to our dissenting colleague’s view, our holding today will not chill the authority of the People to investigate claims regarding stolen art. Nothing in our decision should be construed as supporting that proposition. The dissent also has hypothesized a number of instances in which the “retention of loaned fine art would be crucial to the resolution of a criminal investigation.” While we do not rule out the possibility that such circumstances may justify retention, we need not and do not pass upon these hypotheticals, inasmuch as they are not before us and are not pertinent to the determination of this appeal. Nor should our decision be interpreted as circumscribing the broad, exploratory powers of Grand Juries. The People are not prohibited from continuing the Grand Jury investigation of possible criminal wrongdoing with regard to these two paintings.[3]
The dissent also concludes that our holding “implicates” the Fourth Amendment of the United States Constitution and *741 article I, § 12 of the New York State Constitution. (Dissenting opn, at 748.) That conclusion is not warranted or supported by our holding. The analysis necessary to resolve this case is not of a constitutional dimension.
This Court has examined a Grand Jury subpoena in the context of the limitations imposed by the Fourth Amendment and article I, § 12 regarding seizures of property (see, Matter of Grand Jury Subpoenas, 72 NY2d 307). However, this case is not about a subpoena that is “too sweeping in its terms to be regarded as reasonable” (Hale v Henkel, 201 US 43, 76), nor is this a dispute about whether a Grand Jury must have probable cause before it can issue a subpoena duces tecum (see, Matter of Hynes v Moskowitz, 44 NY2d 383). The prohibition of the statute is broader than the constitutional concerns of unreasonable seizures. Any seizure is prohibited under the statute. An unreasonable seizure presents a constitutional dilemma, but that analysis does not define if the object has indeed been seized. Thus, although the subpoena may pass constitutional muster, the statute stands in its way.
Lastly, the dissent argues that we have foreclosed every circumstance that may involve the retention of loaned art in a criminal investigation. We disagree with the characterization. Under the circumstances of this case the subpoena at issue does in fact constitute meaningful interference with the Leopold Foundation’s possessory interest. None of the mechanisms that may be available to the Museum as designee of the Foundation can effectuate a return of the paintings without an ownership determination. Thus, the cornerstone of the Grand Jury investigation remains ownership of these two paintings. The Legislature rejected a disputed-owner exception to the statute; we cannot now abrogate the clear purpose of the statute by creating a criminal proceeding “loophole.”[4]
We fully appreciate the profound and opposing interests presented by this case. The District Attorney has a constitutional responsibility to identify and prosecute criminal activity, while *742 the Museum seeks to make works of art from all over the world available to New Yorkers. These two significant interests have come into conflict as a result of Nazi atrocities. The Legislature of this State made a significant policy decision 30 years ago when it enacted the predecessor to section 12.03. As a court of law, we cannot alter that policy under the guise of legislative interpretation. The language of the statute is clear, the intent of the Legislature manifest.
The People’s remaining argument is without merit.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the Museum’s motion to quash the Grand Jury subpoena duces tecum should be granted.

. The Arts and Cultural Affairs Law is modeled after New York Code of Civil Procedure § 1404a (L 1909, ch 65, § 1). Section 1404a provided for the *736 exemption from seizure of a variety of exhibits shown or loaned by nonresident exhibitors, even where those items were displayed for profit. In 1920, this section was shifted from the Code of Civil Procedure to section 250 of the Personal Property Law (L 1920, ch 934, § 1).
In 1968 Attorney General Louis J. Lefkowitz sponsored legislation that took immunity principles expressed in Personal Property Law § 250 and applied them to the artwork of nonresident lenders (L 1968, ch 1065, § 1). This section was renumbered and moved several times and is now embodied in Arts and Cultural Affairs Law § 12.03 (L 1984, ch 849, § 1).

. This position is at odds with the Practice Commentaries to this statute, which states that subdivision (2) was amended in 1979 “to establish a procedure for obtaining subpoenaed materials prior to trial, so that they could be held by the court, or by the district attorney on behalf of the grand jury, for the purpose of inspection and analysis before actual use in the proceeding” (Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 610.25, at 309 [emphasis added]).

. As Supreme Court pointed out, the paintings are not necessary for the investigation. The value, identity and authenticity of the paintings are not in *741 dispute, and the People recognize and acknowledge the widely accepted practice in which indictments may be secured by means other than the physical presentation and indefinite retention of alleged contraband (see, e.g., CPL 190.30 [3] [e]). Indeed, the court noted that the Museum offered to provide photographic copies of the paintings — a proposal rejected by the prosecution.

. Ironically, the Association of the Bar of the City of New York, which earlier opposed the statute and sought a stolen property exception to the legislation, carefully identified this important fact in the statute’s development in its amicus curiae brief supporting the Museum’s position.