UNITED STATES of America

v.

**PORTRAIT OF WALLY, A Painting by Egon Schiele, Defendant in Rem.**

**No. 99 CIV. 9940 (MBM).**

United States District Court,
S.D. New York.

July 19, 2000.

Mary Jo White, United States Attorney for Southern District of New York, Barbara A. Ward, Sharon Cohen Levin, Assistant United States Attorneys, New York City.

William M. Barron, Karl Geercken, Brigit Kurtz, Julian C. Swearengin, Walter, Conston, Alexander & Green, P.C., New York City, for Claimant Leopold Museum–Privatstiftung.

Stephen M. Harnik, John McGowan, Law Offices of Stephen M. Harnik, New York City, for Claimant Leopold Museum–Privatstiftung.

OPINION and ORDER

MUKASEY, District Judge.

Defendant *in rem* Portrait of Wally, a painting by Egon Schiele ("the painting"), was brought into the United States to be shown at the Museum of Modern Art ("MoMA"), on loan from an Austrian museum, Leopold Museum–Privatsiftung ("the Leopold"). The United States claims that the painting is stolen, and seeks its forfeiture under 19 U.S.C. § 1595a(c) (1994) and 22 U.S.C. § 401(a) (1994). The Leopold moves to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). For the reasons stated below, I find that under controlling law, the painting can not be considered stolen. Accordingly, the Leopold's Rule 12(b)(6) motion is granted.[1]

I.

For the purpose of deciding the Leopold's motion to dismiss, the material facts alleged in the complaint are taken as true. *See Cooper v. Pate*, 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (*per curiam*). In March 1938, Germany annexed Austria, and the property of many Austrian Jews was "aryanized"—confiscated and given to "aryans." (Compl.¶ 5(b))[2] In that year, and as part of the aryanization program, an art gallery owned by Lea Bondi Jaray, a Viennese Jew, was confiscated and given to Friedrich Welz. (*Id.* ¶¶ 5(b))

In 1939, Welz joined the Nazi party and visited Jaray at her apartment. (*Id.* ¶¶ 5(c)-(d)) He saw the painting hanging on a wall, and "insisted" that the 1938 aryanization of Jaray's gallery entitled him to it. (*Id.* ¶ 5(d)) Jaray responded that the painting was part of her private collection and had nothing to do with the gallery, but "Welz continued to pressure [her] for the painting. [Jaray's] husband finally told her that, as they wanted to leave Austria, perhaps as soon as the next day, she should not resist Welz because 'you know what he [Welz] can do.'" (*Id.*) (third bracket in the complaint) Jaray then turned over the painting and fled to London. (*Id.* ¶¶ 5(d))

After World War II ended, Welz was interned on suspicion of having committed war crimes. (*Id.* ¶ 5(g)) His possessions, including artwork, were seized and placed under the authority of the United States Forces in Austria. (*Id.*) With respect to "art restitution," the U.S. Forces were charged with sorting the paintings of imprisoned suspects and returning them to the countries from which they had been

---

1. In view of this conclusion, I need not consider the arguments pressed by MoMA and other museums as to why the complaint should be dismissed, or indeed whether any of these arguments should be heard at all.

2. "Compl." refers to the Second Amended Verified Complaint filed by the United States on December 22, 1999.

taken "in order for those countries to return them to their rightful owners." (*Id.*) The U.S. Forces holding the property recovered from Welz erroneously listed the painting as having belonged to one Heinrich Rieger, and placed it in his collection. (*Id.* ¶ 5(h))

That collection was then distributed to Rieger's heirs, who sold some artworks, including the painting, to the Österreichische Galerie Belvedere ("the Belvedere"), the Austrian National Gallery. (*Id.* ¶ 5(m)) In 1954, Rudolph Leopold acquired the painting from the Belvedere, and in 1994 he sold it to the Leopold. (*Id.* ¶¶ 5(r), (aa))

In 1997, the Leopold sent the painting from Austria to New York, where it was displayed at a MoMA exhibit from October 8, 1997 to January 4, 1998. (*Id.* ¶ 5(bb)) Three days after the exhibit ended, the New York County District Attorney's Office issued a subpoena for the painting; on September 21, 1999, that subpoena was quashed by the New York Court of Appeals.[3] *See In the Matter of the Grand Jury Subpoena Duces Tecum Served on Museum of Modern Art,* 93 N.Y.2d 729, 697 N.Y.S.2d 538, 719 N.E.2d 897 (1999).

That day, United States Magistrate Judge James C. Francis IV issued a seizure warrant for the painting, and the next day the United States started this forfeiture action. (Compl. Ex. A; Dkt. No. 1) Under the statutes cited in the complaint, goods must be forfeited if they were brought into the United States illegally, or if they are to be removed from the United States illegally. *See* 19 U.S.C. § 1595a(c); 22 U.S.C. § 401(a). The government claims that the painting is stolen and that therefore it was imported, and would be exported, in violation of the National Stolen Property Act, 18 U.S.C. § 2314 (1994) (" § 2314"), which prohibits transporting stolen goods in foreign commerce.

## II.

■ Under the common law, "one cannot be convicted of receiving stolen goods if, before the stolen goods reached the receiver, the goods had been recovered by their owner or his agent, including the police." *United States v. Muzii,* 676 F.2d 919, 923 (2d Cir.1982). This doctrine ("the doctrine") is well-established federal law; federal courts routinely apply it in cases involving federal statutes that prohibit the receipt or transportation of stolen goods without inquiring into whether the doctrine is part of the relevant body of local law, as they would have to do if local law controlled this issue.[4] *See, e.g., United States v. Golomb,* 811 F.2d 787, 792 (2d Cir.1987) (18 U.S.C. § 641); *Muzii,* 676 F.2d at 923 (18 U.S.C. § 659); *United States v. Dove,* 629 F.2d 325 (4th Cir.1980) (§ 2314); *United States v. Egger,* 470 F.2d 1179, 1181 (9th Cir.1972) (18 U.S.C. § 2113(c)); *United States v. Cawley,* 255 F.2d 338, 340 (3d Cir.1958) (18 U.S.C. § 1708).

Relying on the doctrine, the Leopold argues that even if the painting was stolen by Welz in 1939, it "ceased being stolen when it was recovered by the United States Forces." Accordingly, the Leopold

---

**3.** The Court of Appeals held that issuance of the subpoena was forbidden by Section 12.03 of New York's Arts and Cultural Affairs Law, which prohibits seizure of "any work of fine art while the same is ... on exhibition ... by a nonresident exhibitor at any exhibition held under the auspices or supervision of any [New York] museum ...."

**4.** The doctrine is the law of some jurisdictions, but not others. *Compare State v. Bujan,* 274 N.J.Super. 132, 643 A.2d 628, 629–30 (App.Div.1994) (construing state statute as abrogating the doctrine); *Vargas v. State,* 818 S.W.2d 875, 879 (Tex.Ct.App.1991) (same);

*State v. Currier,* 521 A.2d 295, 299 (Me.1987) (same); *State v. Pappas,* 705 P.2d 1169, 1173 (Utah 1985) (same); *State v. Sweeney,* 701 S.W.2d 420, 423–24 (Mo.1985) (same) (*en banc*); *and People v. Holloway,* 193 Colo. 450, 568 P.2d 29, 31 (1977) (*en banc*) (same) *with* Jay M. Zitter, Annotation, *Conviction of Receiving Stolen Property, or Related Offenses, Where Stolen Property Previously Placed Under Police Control,* 72 A.L.R.4th 838 (1989) (collecting modern American cases that apply the doctrine); *and Attorney–General's Reference No. 1,* 1974 WL 41579 (Apr. 25, 1974), [1974] Q.B. 744 (collecting English cases that apply the doctrine).

contends, the painting is not forfeitable because it was not brought into the United States, and would not be removed from the United States, in violation of § 2314. (Leopold Mem. at 23–26)

In response, the government argues that the doctrine is irrelevant because (a) Austrian law, and not federal law, controls, and (b) the doctrine applies only when the police use stolen goods as part of a sting operation. For the reasons explained below, I disagree with both arguments.

### A.

■ The government first argues that Austrian law controls the question of whether the painting is "stolen" within the meaning of § 2314, and that the doctrine does not apply because it is not a part of Austrian law. (Gov't Mem. at 65–68) The government relies on two Fifth Circuit cases, *United States v. McClain*, 545 F.2d 988 (Wisdom, J.) (5th Cir.1977) (*McClain I*), and *United States v. McClain*, 593 F.2d 658, 664 (5th Cir.1979), which reviewed the convictions of five people charged, *inter alia*, with violating § 2314 by bringing Mexican antiquities into the United States.

The government contends that the *McClain* cases hold that § 2314 "appl[ies]" to the importation of pre-Columbian artifacts ... classified as stolen under Mexican ... law[ ]." (Gov't Mem. at 66–67) Not so. It is true that the *McClain* Courts referred extensively to Mexican law, but only to determine whether the artifacts were owned such that they could be stolen. *See McClain I*, 545 F.2d at 997–1000 (parsing Mexican statutes to determine when the Mexican state "vested itself with ownership of all pre-Columbian objects"). The *McClain* Courts looked exclusively to federal law to determine whether the artifacts were stolen. *See id.* at 994–95 (parsing federal cases for the meaning of "stolen" and relying, *inter alia*, on *United States v. Turley*, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957)).

This distinction between ownership as defined by local law and stealing as de-

fined by federal law was further apparent in the *McClain I* Court's rejection of the appellants' argument that Mexican law could not be considered for any purpose. Appellants argued that reference to Mexican law was barred by *Jerome v. United States*, 318 U.S. 101, 63 S.Ct. 483, 87 L.Ed. 640 (1943), under which the meaning of a federal criminal statute may not ordinarily depend on non-federal law. Judge Wisdom responded:

> The reasoning of *Jerome* does not support the appellants' position here. We suggest that the key to *Jerome* is that behavior punishable in one state would not be punishable in another state. Here, our decision to refer to foreign declarations of ownership does not create the state-by-state divergence avoided in *Jerome*. It poses the possibility, of course, that similar exportations from different countries might lead to different results in the United States. But the National Stolen Property Act has a specific scienter requirement—knowledge that stolen goods are stolen—that protects a defendant who might otherwise be trapped by such differences.

*See McClain I*, 545 F.2d at 1001 n. 30. In other words, under *Jerome* the conduct that is proscribed by the federal criminal laws—"behavior punishable"—may not ordinarily vary from one jurisdiction to another. However, *Jerome* does not imply that the core of proscribed conduct must lead to the same consequences for property from every jurisdiction—"different results" are permissible so long as there is a mechanism that protects defendants "who might otherwise be trapped by such differences." In the case of § 2314, that mechanism is a uniformly applied *scienter* requirement. Given this reading of what is "key to *Jerome*," "stolen" *must* be defined by reference to federal law, regardless of how ownership is defined. Otherwise, the conduct proscribed by § 2314 would vary between jurisdictions, and such inconsistency is forbidden by *Jerome*.

The Fifth Circuit's *McClain* cases cut against the government's argument that the meaning of "stolen" is controlled by

Austrian law. The *McClain* cases do not hold that § 2314 applies to items that are "classified as *stolen* under [the relevant body of local] . . . law[ ]." (Gov't Mem. at 66–67) (emphasis added) Rather, the cases hold that if the federal law definition of "stolen" is satisfied, § 2314 applies to items that are classified as *owned*—*i.e.*, as property—under local law.

Second Circuit caselaw accords with *McClain*, and further undermines the government's position. In *United States v. Long Cove Seafood, Inc.*, 582 F.2d 159 (2d Cir.1978), the Court reviewed a District Court's dismissal of four § 2314 counts; the District Court had held that § 2314 does not apply to receipt of clams harvested in New York. The Circuit Court defined "stolen" with exclusive reference to federal cases—as a " 'felonious taking[ ] . . . with intent to deprive the owner of the rights and benefits of ownership.' " *Id.* at 163 (quoting *Turley*, 352 U.S. at 417, 77 S.Ct. 397); *see also United States v. Handler*, 142 F.2d 351, 353 (2d Cir.1944). However, the *Long Cove* Court noted that "whether a particular item is 'stolen' cannot be decided in a vacuum, without considering whether there has been some sort of interference with a property interest." *Long Cove Seafood, Inc.*, 582 F.2d at 163. Therefore, it looked to New York law to determine whether the clams were owned—by the state or a municipality— such that they could be stolen.[5] *See id.* at 163–65.

There is some tension between *Long Cove* and *United States v. Greco*, 298 F.2d 247 (2d Cir.1962), but this tension does not diminish *Long Cove*'s authority. In *Greco*, the Court upheld a § 2314 conviction for receipt of stolen Canadian securities. It "presume[d] that these securities would be considered stolen under Canadian law." *See id.* at 251. The *Greco* Court thus suggested that whether an item is "stolen" is a local law question. However, this sug-

gestion is flatly incompatible with the Court's subsequent conclusion that the meaning of stolen is governed by federal law. *See Long Cove Seafood, Inc.*, 582 F.2d at 163. Therefore, it must be deemed to have been rejected *sub silentio* by the *Long Cove* Court. Moreover, I have not found any case other than *Greco* even implying that the meaning of "stolen" is controlled by local law. Finally, the *Greco* Court did not have to reach the question that is at issue here and that was resolved in *Long Cove*—namely, which law, federal or local, determines the meaning of "stolen." *See Greco*, 298 F.2d at 251 ("We are not here concerned with the unlikely case where the goods or securities might be 'stolen' according to the laws of one of the two countries and yet not be 'stolen' according to the laws of the other country. In the absence of citation of statutes or decisional authority to the contrary, we may presume that these securities would be considered stolen under Canadian law.")

■ Under both the *McClain* cases and *Long Cove*, federal law controls the question of whether an item is stolen, and local law—Mexican law in *McClain*, and New York law in *Long Cove*—controls the analytically prior issues of (a) whether any person or entity has a property interest in the item such that it can be stolen, and (b) whether the receiver of the item has a property interest it. These issues are wholly distinct from the question of the conditions under which a once-stolen item ceases to be stolen. The answer to the latter question is determined by federal law and not local law, and the doctrine applies. *See supra* at 290–91 (noting that the doctrine is a well-established part of federal law).

### B.

■ The government argues also that the doctrine is irrelevant here because it

5. The *Long Cove* Court referred to New York's larceny laws, but only (a) as "evidence that New York does not claim a right of possession of wildlife," *Long Cove Seafood, Inc.*, 582 F.2d at 165, and (b) to explain that the government was proceeding under § 2314 because proceeding under a larceny theory would have presented "difficult[ ]" proof problems, *see id.* at 164.

applies only to cases involving sting operations—*i.e.*, to cases "where police recover stolen goods and deliver them to another person who believes the goods to be stolen." (Gov't Mem. at 69)

The government's argument would be persuasive if the purpose of the doctrine were to limit law enforcement officials by creating a special entrapment defense—one particular to the crime of receiving stolen goods. Some authorities suggest that. *See, e.g., United States v. Cohen*, 274 F. 596, 599 (3d Cir.1921) ("When the actual, physical possession of stolen property has been recovered by the owner or his agent, its character as stolen property is lost, and the subsequent delivery of the property by the owner or agent to a particeps criminis, *for the purpose of entrapping him* as the receiver of stolen goods, does not establish the crime, for in a legal sense he does not receive stolen property.") (emphasis added); *see also Ex parte Walls*, 711 So.2d 490, 495 (Ala.1997); *State v. Hageman*, 307 N.C. 1, 296 S.E.2d 433, 439 (1982); *cf. State v. Minnick*, 113 Kan. 385, 214 P. 111, 112 (1923).

However, the cases in which the doctrine was first articulated do not refer to entrapment or any similar concept. *See Regina v. Dolan*, 169 Eng. Rep. 794, 795–98 (1855); *Regina v. Schmidt*, 1 Cr. Cas. Res. 15 (1866). Similarly, in its only substantial encounter with the doctrine, the Second Circuit did not mention entrapment. Instead, the Court assumed that the doctrine is rooted in agency principles, as do most modern courts. *See Muzii*, 676 F.2d at 923 ("one cannot be convicted of receiving stolen goods if, before the stolen goods reached the receiver, the goods had been recovered by their owner or his agent, including the police"); *United States v. Monasterski*, 567 F.2d 677, 679 (6th Cir.1977) (describing "[t]he rule that one cannot be convicted of receiving stolen goods if, before the stolen goods reached the would-be receiver, the goods had been

recovered by their owner or his agent"); *Ohio v. Pyle*, Case No. 9–237, 1983 WL 6072, at *3 (Ohio App. 11th Dist. Dec. 30, 1983) ("[t]he general rule ... is that once the police physically recover items of stolen property, the items lose their status as 'stolen' because the police are agents of the true owner"); *see also, e.g., State v. Diephaus*, 55 Ohio App.3d 90, 562 N.E.2d 523, 525 (1st Dist.1989); *Farzley v. State*, 231 Ala. 60, 163 So. 394, 395 (1935); *cf. People v. Towery*, 174 Cal.App.3d 1114, 220 Cal.Rptr. 475, 492 (1985).

Under the logic of the Second Circuit's approach, the doctrine is not triggered by recovery of a stolen item only by the police, but rather by recovery of a stolen item "by the[ ] owner or his agent, *including* the police." *Muzii*, 676 F.2d at 923 (emphasis added). Therefore, the dispositive question is not whether the U.S. Forces' recovery of the painting should be characterized as a recovery by law enforcement officials. Rather, the question is whether the U.S. Forces' recovery of the painting was a recovery by an agent of the painting's true owner. If so, the recovery is attributed to her and the painting ceased to be stolen when the U.S. Forces took possession of it, just as if she had done so herself.

■ Ordinarily, "[a]n agency relationship exists only if there has been a manifestation by the principal to the agent that the agent may act on [her] account." *Restatement (Second) of Agency* § 15 (1958). However, for the purpose of triggering application of the doctrine such consent is unnecessary, because the law implies a principal-agent relationship between the true owner of a lost item and the government officials who recover it, and who are deemed to act on her behalf because they are charged by law with doing so.[6] *See Dove*, 629 F.2d at 327 ("Because law enforcement officers hold recaptured stolen goods in trust for the true owner, the

---

6. I need not define the limits of this agency relationship. It is sufficient to note that the relationship triggers application of the doctrine; any other effect it may have on the

duties and powers of government officials and true owners toward one another is not at issue here.

courts have uniformly held the police to be agents of the owner for purposes of the [doctrine].");  *People v. Rojas,* 55 Cal.2d 252, 10 Cal.Rptr. 465, 358 P.2d 921, 924–25 (1961) ("[T]he People ... [argue] that the goods, when they came into the hands of defendants, had not lost their stolen character because [the police officer] ... was acting as 'agent' of the city and not of the true owner.  We believe that both the owner and the police would take unkindly to the suggestion that property which has been the subject of larceny and has then been recovered by law enforcement officers remains 'stolen' while it is under the surveillance of the police.  It seems obvious that stolen property, recaptured by the police, no longer has the status of stolen goods but, rather, is held by the police in trust for, or for the account of, the owner.");  *United States v. Johnson,* 767 F.2d 1259, 1267 n. 7 (8th Cir.1985) ("[The doctrine] has evolved from English cases in the last century holding that goods recovered by their true owner lose their stolen character.  Courts in this country added the principle that recovery by law enforcement officials may be presumed to be recovery by the owner's agent.") (citations to *Dolan, Schmidt,* and *Rojas* omitted).

Because this agency relationship does not depend on the principal's consent, "[i]t is irrelevant that, at the time of the sale to defendant [charged with receiving stolen goods], the true owners of the property had not been located; from the time of recovery, the police were, in effect, agents of the rightful owners holding the property on their behalf."  *People v. Zaborski,* 59 N.Y.2d 863, 865, 465 N.Y.S.2d 927, 929, 452 N.E.2d 1255 (1983).  Therefore, as a practical matter the doctrine "that goods cease to be stolen if recovered by the owner or his agent means that such goods cease to be stolen if recovered by the owner *or anyone who has a right to possession or control over them.*"  *United States v. Cawley,* 255 F.2d 338, 341 (3rd Cir.1958) (*per curiam* ) (emphasis added); *cf.* Theft Act, 1968, ch. 60, § 24(3) (Eng.) ("no goods shall be regarded as having continued to be stolen goods after they have been re-stored to the person from whom they were stolen or to other lawful possession or custody").

In this case, the U.S. Forces were charged with recovering stolen items and acting on behalf of the items' true owners. (Compl.¶ 5(g)) Accordingly, when they recovered the painting they did so as agents of Lea Bondi Jaray—even though they did not know her name, or that the painting was hers.  *See Zaborski,* 59 N.Y.2d at 865, 465 N.Y.S.2d at 929, 452 N.E.2d 1255. This recovery purged the painting of the taint that it had.  Although the painting may not have been placed in the correct hands when the Rieger heirs received it, in the eyes of the law it was no longer stolen.

\*     \*     \*     \*     \*     \*

For the reasons stated above, the motion is granted and the complaint is dismissed.  The dissolution of Judge Francis's seizure warrant is stayed pending a hearing before the United States Court of Appeals for the Second Circuit as to any application that the government may make to that Court for a further stay.